850 F.2d 36
 27 ERC 2133, 56 USLW 2724, 18 Envtl.
L. Rep. 20,874
 John A. BERSANI, Newport Galleria Group, Robert J. Congel
and the Pyramid Companies, Appellants,
Joseph Robichaud and Citizens in Support of Attleboro Mall,
Intervenor- Plaintiffs-Appellants,
Home Building Association of Massachusetts, Intervenor-Plaintiff,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, United States
Army Corps of Engineers, Lee Thomas, in his official
capacity as Administrator of the United States Environmental
Protection Agency, Richard K. Dawson, in his official
capacity as Assistant Secretary for Civil Works, United
States Army, and Jennifer Joy Wilson, in her official
capacity as Assistant Administrator for External Affairs,
United States Environmental Protection Agency, Appellees,
Sierra Club, Environmental Defense Fund, National Wildlife
Federation, National Audubon Society, Conservation Law
Foundation of New England, Inc., Massachusetts Audubon
Society, Citizens for Responsible Environmental Management,
Massachusetts Society for Conservation Professionals,
Audubon Society of Rhode Island, Rhode Island Association of
Conservation Commissioners and Natural Resources Defense
Council, Intervenor-Defendants.
 Nos. 852, 902, Dockets 87-6275, 87-6295.
 United States Court of Appeals,
Second Circuit.
 Argued March 16, 1988.
Decided June 8, 1988.
 
 Albert J. Beveridge, III, Washington, D.C. (Gary H. Baise, Virginia S. Albrecht, Marc A. Zeppetello, David M. Friedland, and Beveridge & Diamond, Washington, D.C., on the brief), for appellants.
 Paul D. Kamenar, Washington, D.C. (Daniel J. Popeo, Washington, D.C., and Henry M. Holzer, Brooklyn, N.Y., on the brief), for intervenor-appellants.
 Donald A. Carr, Dept. of Justice, Washington, D.C. (Roger J. Marzulla, Acting Asst. Atty. Gen., Peter R. Steenland, Jr., Margaret N. Strand, Dept. of Justice, Gail B. Cooper, E.P.A., Washington, D.C., and Ann H. Williams-Dawe, E.P.A., Boston, Mass., on the brief), for appellees.
 James T.B. Tripp, Environmental Defense Fund, New York City (Michael E. Herz, Environmental Defense Fund, New York City, Michael J. Bean, Environmental Defense Fund, Washington, D.C., Hope Babcock, National Audubon Society, Washington, D.C., Robert Dreher, Sierra Club Legal Defense Fund, Washington, D.C., Jerry Jackson, National Wildlife Federation, Washington, D.C., and Peter Shelley, Conservation Law Foundation of New England, Boston, Mass., on the brief), for intervenor-appellees.
 R. Sarah Compton, Carl W. Schwarz, Kurt J. Olson, and McDermott, Will & Emery, U.S. Chamber of Commerce, Washington, D.C., and Robin S. Conrad, National Chamber Litigation Center, Washington, D.C., filed a brief as amicus curiae.
 Before TIMBERS, PRATT and MINER, Circuit Judges.
 TIMBERS, Circuit Judge:
 
 
 1
 Appellants John A. Bersani, the Pyramid Companies, Newport Galleria Group and Robert J. Congel ("Pyramid", collectively) appeal from a judgment entered October 23, 1987 in the Northern District of New York, Thomas J. McAvoy, District Judge, granting summary judgment in favor of appellees, the United States Environmental Protection Agency ("EPA"), the United States Army Corps of Engineers (the "Corps"), Lee Thomas, the Administrator of the EPA, Richard K. Dawson, Assistant Secretary for Civil Works, United States Army, and Jennifer Joy Wilson, Assistant Administrator for External Affairs of the EPA (the "Federal Appellees" collectively), and denying Pyramid's motion for summary judgment. Bersani v. EPA, 674 F.Supp. 405 (N.D.N.Y. 1987).
 
 
 2
 This case arises out of Pyramid's attempt to build a shopping mall on certain wetlands in Massachusetts known as Sweedens Swamp. Acting under the Clean Water Act, 33 U.S.C. Sec. 1251 et seq. (1982), EPA vetoed the approval by the Corps of a permit to build the mall because EPA found that an alternative site had been available to Pyramid at the time it entered the market to search for a site for the mall. The alternative site was purchased later by another developer and arguably became unavailable by the time Pyramid applied for a permit to build the mall.
 
 
 3
 On appeal, the thrust of Pyramid's argument is a challenge to what it calls EPA's "market entry" theory, i.e., the interpretation by EPA of the relevant regulation, which led EPA to consider the availability of alternative sites at the time Pyramid entered the market for a site, instead of at the time it applied for a permit. Pyramid argues principally (1) that the market entry approach is contrary to the regulatory language and past practice; and (2) that since the Corps, another agency which was jointly responsible with EPA for administering the program in question, interpreted the pertinent regulation in a different way than EPA had, and since the market entry issue does not involve environmental expertise, this Court should not defer to EPA's interpretation of the regulation. Other subordinate claims are raised by appellants as well as by two intervenors and the amicus curiae.[1]
 
 
 4
 We hold (1) that the market entry theory is consistent with both the regulatory language and past practice; (2) that EPA's interpretation, while not necessarily entitled to deference, is reasonable; and (3) that EPA's application of the regulation is supported by the administrative record. We agree with the district court's conclusion that EPA's findings were not arbitrary and capricious. We also hold that Pyramid's other arguments, and the arguments of one intervenor and the amicus, lack merit.
 
 
 5
 We affirm.
 
 I.
 
 6
 We shall summarize only those facts and prior proceedings believed necessary to an understanding of the issues raised on appeal.
 
 A. Statutory and Regulatory Framework
 
 7
 One of the sections of the Clean Water Act (the "Act") relevant to the instant case is Sec. 301(a), 33 U.S.C. Sec. 1311(a) (1982), which prohibits the discharge of any pollutant, including dredged or fill materials, into the nation's navigable waters, except in compliance with the Act's provisions, including Sec. 404. It is undisputed that Sweedens Swamp is a "navigable water", as defined in 33 U.S.C. Sec. 1362 (1982), and that Pyramid's shopping center proposal will involve the discharge of dredged or fill materials.
 
 
 8
 Section 404 of the Act, 33 U.S.C. Sec. 1344 (1982 & Supp. III 1985), focusing on dredged or fill materials, provides that the United States Army and EPA will share responsibility for implementation of its provisions. EPA and the Corps also share responsibility for enforcing the Act. 33 U.S.C. Secs. 1311 (1982), 1319 (1982), 1344(n) and (s) (1982). Section 404(a) authorizes the Secretary of the Army, acting through the Corps, to issue permits for the discharge of dredged or fill materials at particular sites. 33 U.S.C. Sec. 1344(a) (1982). Section 404(b) provides that, subject to Sec. 404(c), the Corps must base its decisions regarding permits on guidelines (the "404(b)(1) guidelines") developed by EPA in conjunction with the Secretary of the Army. 33 U.S.C. Sec. 1344(b) (Supp. III 1985).
 
 
 9
 The 404(b)(1) guidelines, published at 40 C.F.R. Part 230 (1987), are regulations containing the requirements for issuing a permit for discharge of dredged or fill materials. 40 C.F.R. Sec. 230.10(a)[2] covers "non-water dependent activities" (i.e., activities that could be performed on non-wetland sites, such as building a mall) and provides essentially that the Corps must determine whether an alternative site is available that would cause less harm to the wetlands. Specifically, it provides that "no discharge of dredged or fill material shall be permitted if there is a practicable alternative" to the proposal that would have a "less adverse impact" on the "aquatic ecosystem". It also provides that a practicable alternative may include "an area not presently owned by the applicant which could reasonably be obtained, utilized, expanded or managed in order to fulfill the basic purpose of the proposed activity." 40 C.F.R. 230.10(a)(2). It further provides that, "unless clearly demonstrated otherwise", practicable alternatives are (1) "presumed to be available" and (2) "presumed to have less adverse impact on the aquatic ecosystem". 40 C.F.R. 230.10(a)(3). Thus, an applicant such as Pyramid must rebut both of these presumptions in order to obtain a permit. Sections 230.10(c) and (d) require that the Corps not permit any discharge that would contribute to significant degradation of the nation's wetlands and that any adverse impacts must be mitigated through practicable measures.
 
 
 10
 In addition to following the 404(b)(1) guidelines, the Corps may conduct a "public interest review". 33 C.F.R. Sec. 320.4 (1987). This public interest review is not mandatory under Sec. 404, unlike consideration of the 404(b) guidelines. In a public interest review, the Corps' decision must reflect the "national concern" for protection and use of resources but must also consider the "needs and welfare of the people." Id.
 
 
 11
 Under Sec. 404(c) of the Act, 33 U.S.C. Sec. 1344(c), EPA has veto power over any decision of the Corps to issue a permit. It is this provision that is at the heart of the instant case.
 
 
 12
 Specifically, Sec. 404(c) provides that the Administrator of EPA may prohibit the specification of a disposal site "whenever he determines, after notice and opportunity for public hearings, that the discharge of materials into such area will have an unacceptable adverse effect" on, among other things, wildlife.[3] An "unacceptable adverse effect" is defined in 40 C.F.R. Sec. 231.2(e) as an effect that is likely to result in, among other things, "significant loss of or damage to ... wildlife habitat". The procedure under Sec. 404(c) begins with the Regional Administrator ("RA") who, under Sec. 231.3(a), must notify the Corps and the applicant when it is possible he will find an "unacceptable adverse effect". If within 15 days the applicant fails to satisfy the RA that no such effect will occur, the RA must publish his proposed determination to veto the grant of a permit. A period for public comment and an optional public hearing follows, after which the RA either withdraws the determination or submits a recommended determination to the national Administrator, whose decision to affirm, modify or rescind the RA's recommendation is the final determination of EPA for purposes of judicial review. The burden of proving that the discharge will have an "unacceptable adverse effect" is on EPA. 45 Fed.Reg. 85,336, 85,338 (1980); 44 Fed.Reg. 58,076, 58,080 (1979).
 
 
 13
 In short, both EPA and the Corps are responsible for administering the program for granting permits for discharges of pollutants into wetlands under Sec. 404. The Corps has the authority to issue permits following the 404(b)(1) guidelines developed by it and EPA; EPA has the authority under Sec. 404(c) to veto any permit granted by the Corps. The Corps processes about 11,000 permit applications each year. EPA has vetoed five decisions by the Corps to grant permits.
 
 
 14
 B. Factual Background of the Sweedens Swamp Project
 
 
 15
 Sweedens Swamp is a 49.5 acre wetland which is part of an 80 acre site near Interstate 95 in South Attleboro, Massachusetts. Although some illegal dumping and motorbike intrusions have occurred, these activities have been found to have had little impact on the site which remains a "high-quality red maple swamp" providing wildlife habitat and protecting the area from flooding and pollution.
 
 
 16
 The effort to build a mall on Sweedens Swamp was initiated by Pyramid's predecessor, the Edward J. DeBartolo Corporation ("DeBartolo"). DeBartolo purchased the Swamp some time before April 1982. At the time of this purchase an alternative site was available in North Attleboro (the "North Attleboro site"). Since Massachusetts requires state approval (in addition to federal approval) for projects that would fill wetlands, DeBartolo applied to the Massachusetts Department of Environmental Quality Engineering ("DEQE") for permission to build on Sweedens Swamp. DEQE denied the application in April 1982.
 
 
 17
 Pyramid took over the project in 1983 while the appeal of the DEQE denial was pending. In April 1983, Massachusetts adopted more rigorous standards for approval of permits. The new standards added wildlife habitat as a value of wetlands to be protected and required the absence of a "practicable alternative". In March 1985, DEQE granted approval under the old, less stringent, regulations. The Massachusetts District Court reversed on the ground that DEQE should have applied the new regulations, but the Massachusetts Supreme Judicial Court ultimately upheld DEQE's approval. Citizens for Responsible Environmental Management v. Attleboro Mall, Inc., 400 Mass. 658, 511 N.E.2d 562 (1987).
 
 
 18
 One of the key issues in dispute in the instant case is just when did Pyramid begin searching for a suitable site for its mall. EPA asserts that Pyramid began to search in the Spring of 1983. Pyramid asserts that it began to search several months later, in September 1983. The difference is crucial because on July 1, 1983--a date between the starting dates claimed by EPA and Pyramid--a competitor of Pyramid, the New England Development Co. ("NED"), purchased options to buy the North Attleboro site. This site was located upland and could have served as a "practicable alternative" to Sweedens Swamp, if it had been "available" at the relevant time. Thus, if the relevant time to determine whether an alternative is "available" is the time the applicant is searching for a site (an issue that is hotly disputed), and if Pyramid began to search at a time before NED acquired options on the North Attleboro site, there definitely would have been a "practicable alternative" to Sweedens Swamp, and Pyramid's application should have been denied. On the other hand, if Pyramid did not begin its search until after NED acquired options on the North Attleboro site, then the site arguably was not "available" and the permit should have been granted. Of course it also is possible that the North Attleboro site remained "available" after NED's acquisition of the options, since Pyramid arguably could have purchased the options from NED. Moreover, since the North Attleboro site indisputably was "available" when Pyramid's predecessor, DeBartolo, purchased Sweedens Swamp, one might argue, as EPA does, that Pyramid should be held to stand in its predecessor's shoes. The district court apparently agreed with Pyramid on the issue of when Pyramid entered the market, stating that "Pyramid initially became interested in developing a shopping mall in the Attleboro area in September 1983". Bersani v. EPA, supra, 674 F.Supp. at 409.
 
 
 19
 In December 1983, Pyramid purchased Sweedens Swamp from DeBartolo. In August 1984, Pyramid applied under Sec. 404(a) to the New England regional division of the Corps (the "NE Corps") for a permit. It sought to fill or alter 32 of the 49.6 acres of the Swamp; to excavate nine acres of uplands to create artificial wetlands; and to alter 13.3 acres of existing wetlands to improve its environmental quality. Later Pyramid proposed to mitigate the adverse impact on the wetlands by creating 36 acres of replacement wetlands in an off-site gravel pit.
 
 
 20
 During the review of Pyramid's application by EPA, by the Fish and Wildlife Service ("FWS") and by the Corps, Pyramid submitted information on "practicable alternatives", especially the North Attleboro site. In rejecting that site as an alternative, Pyramid asserted that building a mall there was not feasible, not that the site was unavailable. In the words of the district court, Pyramid claimed that
 
 
 21
 "the site lacked sufficient traffic volume and sufficient access from local roads, potential department store tenants had expressed strong doubts about the feasibility of the site and previous attempts to develop the site had met with strong resistance from the surrounding community."
 
 
 22
 Bersani, supra, 674 F.Supp. at 410 (emphasis added).
 
 
 23
 In November 1984, EPA and FWS submitted official comments to the NE Corps recommending denial of the application because Pyramid's proposal was inconsistent with the 404(b)(1) guidelines. Pyramid had failed (1) to overcome the presumption of the availability of alternatives and (2) to mitigate adequately the adverse impact on wildlife. EPA threatened a Sec. 404(c) review. Pyramid then proposed to create additional artificial wetlands at a nearby upland site, a proposal it eventually abandoned.
 
 
 24
 In January 1985, the NE Corps hired a consultant to investigate the feasibility of Sweedens Swamp and the North Attleboro site. The consultant reported that either site was feasible but that from a commercial standpoint only one mall could survive in the area. On February 19, 1985, the NE Corps advised Pyramid that denial of its permit was imminent. On May 2, 1985, the NE Corps sent its recommendation to deny the permit to the national headquarters of the Corps. Although the NE Corps ordinarily makes the final decision on whether to grant a permit, see 33 C.F.R. Sec. 325.8 (1982), in the instant case, because of widespread publicity, General John F. Wall, the Director of Civil Works at the national headquarters of the Corps, decided to review the NE Corps' decision. Wall reached a different conclusion. He decided to grant the permit after finding that Pyramid's offsite mitigation proposal would reduce the adverse impacts sufficiently to allow the "practicable alternative" test to be deemed satisfied. He stated:
 
 
 25
 "In a proper case, mitigation measures can be said to reduce adverse impacts of a proposed activity to the point where there is no 'easily identifiable difference in impact' between the proposed activity (including mitigation) versus the alternatives to that activity."
 
 
 26
 Although he did not explicitly address the issue, Wall apparently assumed that the relevant time to determine whether there was a practicable alternative was the time of the application, not the time the applicant entered the market. In other words, Wall appears to have assumed that the market entry theory was not the correct approach. For example, while addressing the traditional "practicable alternatives" analysis as an alternative ground for his decision, Wall found that the North Attleboro site was unavailable "because it has been optioned by another developer". Since the site was not optioned at the time EPA argues Pyramid entered the market, this language suggests (to Pyramid at least) that Wall could not have been employing the market entry approach.
 
 
 27
 On May 31, 1985, Wall ordered the NE Corps to send Pyramid, EPA and FWS a notice of its intent to grant the permit. The NE Corps complied on June 28, 1985.
 
 
 28
 On July 23, 1985, EPA's RA initiated a Sec. 404(c) review of the Corps' decision. Following the procedure set forth in 40 C.F.R. Part 231 (discussed above), EPA published notice of its intent to prohibit the project in the Federal Register; held a public hearing on September 26, 1985; and permitted a period for public comment which closed on October 4, 1985. A second hearing was held on November 18, 1985.
 
 
 29
 On March 4, 1986, the RA recommended that EPA veto the permit because of adverse impacts on wildlife and available "practicable alternatives". In particular, the RA found that Pyramid had not overcome the presumption that an alternative existed, in part because Pyramid had failed to provide information on the availability of the North Attleboro site. After first refusing to provide the information, Pyramid later had claimed "there is no further or more detailed information. It simply does not exist." The RA alternatively reasoned that the North Attleboro site had been available to DeBartolo, and that EPA should attribute this availability to Pyramid because Pyramid had benefitted from DeBartolo's application for state approval.
 
 
 30
 On May 13, 1986, EPA issued its final determination, which prohibited Pyramid from using Sweedens Swamp. It found (1) that the filling of the Swamp would adversely affect wildlife; (2) that the North Attleboro site could have been available to Pyramid at the time Pyramid investigated the area to search for a site; (3) that considering Pyramid's failure or unwillingness to provide further materials about its investigation of alternative sites, it was uncontested that, at best, Pyramid never checked the availability of the North Attleboro site as an alternative; (4) that the North Attleboro site was feasible and would have a less adverse impact on the wetland environment; and (5) that the mitigation proposal did not make the project preferable to other alternatives because of scientific uncertainty of success. In the second of these findings, EPA used what Pyramid calls the "market entry" approach.
 
 
 31
 On July 1, 1986, Pyramid commenced the instant action in the district court to vacate EPA's final determination as arbitrary and capricious. After the parties filed cross-motions for summary judgment, the newspapers reported that Pyramid intended to enter a joint venture with NED to build a mall at the North Attleboro site. Affidavits submitted concerning this development did not indicate whether Pyramid planned to continue the Sweedens Swamp project. Since the joint venture agreement was still in draft form, EPA did not take the position that the case was moot.
 
 
 32
 On October 6, 1987, the court granted EPA's motion for summary judgment. The court stated that, with regard to the market entry theory, EPA's interpretation of its regulations was entitled to deference. This appeal followed.
 
 
 33
 For the reasons which follow, we affirm.
 
 II.
 
 34
 One of Pyramid's principal contentions is that the market entry approach is inconsistent with both the language of the 404(b)(1) guidelines and the past practice of the Corps and EPA.
 
 A.
 
 35
 With regard to the language of the regulations, Pyramid reasons that the 404(b)(1) guidelines are framed in the present tense, while the market entry approach focuses on the past by considering whether a practicable alternative was available at the time the applicant entered the market to search for a site. To support its argument that the 404(b)(1) guidelines are framed in the present tense, Pyramid quotes the following language:
 
 
 36
 "An alternative is practicable if it is available.... If it is otherwise a practicable alternative, an area not presently owned by the applicant which could reasonably be obtained, utilized, expanded or managed in order to fulfill the basic purpose of the proposed activity may be considered."
 
 
 37
 40 C.F.R. Sec. 230.10(a)(2) (emphasis added). It then argues that EPA says "is" means "was". It cites Gwaltney of Smithfield v. Chesapeake Bay Foundation, 108 S.Ct. 376, 381 (1987), to indicate that the Supreme Court believes that the "most natural" reading of present tense language in Sec. 505(a) of the Act refers only to the present and future.
 
 
 38
 While this argument has a certain surface appeal, we are persuaded that it is contrary to a common sense reading of the regulations; that it entails an overly literal and narrow interpretation of the language; and that it creates requirements not intended by Congress.
 
 
 39
 First, while it is true that the language is in the present tense, it does not follow that the "most natural" reading of the regulations would create a time-of-application rule. As EPA points out, "the regulations do not indicate when it is to be determined whether an alternative 'is' available," (emphasis in original), i.e., the "present" of the regulations might be the time the application is submitted; the time it is reviewed; or any number of other times. Based upon a reading of the language in the context of the controlling statute and the regulations as a whole, moreover, we conclude that when the agencies drafted the language in question they simply were not thinking of the specific issues raised by the instant case, in which an applicant had available alternatives at the time it was selecting its site but these alternatives had evaporated by the time it applied for a permit. We therefore agree with the district court that the regulations are essentially silent on the issue of timing and that it would be appropriate to consider the objectives of the Act and the intent underlying the promulgation of the regulations. Bersani, supra, 674 F.Supp. at 412.
 
 
 40
 Second, as EPA has pointed out, the preamble to the 404(b)(1) guidelines states that the purpose of the "practicable alternatives" analysis is "to recognize the special value of wetlands and to avoid their unnecessary destruction, particularly where practicable alternatives were available in non-aquatic areas to achieve the basic purpose of the proposal." 45 Fed.Reg. 85,338 (1980) (emphasis added). In other words, the purpose is to create an incentive for developers to avoid choosing wetlands when they could choose an alternative upland site. Pyramid's reading of the regulations would thwart this purpose because it would remove the incentive for a developer to search for an alternative site at the time such an incentive is needed, i.e., at the time it is making the decision to select a particular site. If the practicable alternatives analysis were applied to the time of the application for a permit, the developer would have little incentive to search for alternatives, especially if it were confident that alternatives soon would disappear. Conversely, in a case in which alternatives were not available at the time the developer made its selection, but became available by the time of application, the developer's application would be denied even though it could not have explored the alternative site at the time of its decision.
 
 
 41
 Pyramid attacks this reasoning by arguing that few developers would take the risk that an available alternative site would become unavailable and that EPA's reading improperly considers the motives and subjective state of mind of the applicant. These arguments are wide of the mark. Whether most real-life developers would take such a risk is irrelevant. The point is that Pyramid's time-of-application theory is completely at odds with the expressed intent of the regulations to provide an incentive to avoid choosing wetlands. Similarly, EPA's interpretation does not require courts to investigate the subjective state of mind of a developer. EPA discusses state-of-mind issues only because it is discussing the purpose behind the regulations, which is concerned with incentives, and thus in fact is indirectly concerned with the developer's state of mind.
 
 
 42
 In short, we conclude that a common-sense reading of the statute can lead only to the use of the market entry approach used by EPA.
 
 B.
 
 43
 With regard to the past practice of the Corps and EPA, Pyramid asserts that neither has ever applied a market entry approach. It first cites two previous final determinations of EPA, known as the "Final Determination of the Assistant Administrator for External Affairs Concerning the Jack Maybank Site on Jehossee Island, South Carolina Pursuant to Section 404(c) of the Clean Water Act," April 5, 1985 ("Maybank Determination"), and the "Final Determination of the Administrator Concerning M.A. Norden Site Pursuant to Section 404(c) of the Clean Water Act," June 15, 1984 ("Norden Determination"). On the basis of these determinations, Pyramid argues that, had EPA been using a market entry approach in these cases, it would have examined whether alternatives were available at earlier times and that EPA had failed to make such an examination. Pyramid also cites National Audubon Society v. Hartz Mountain Dev. Corp., 14 Envtl.L.Rep. 20724 (Envtl.L.Inst.) (D.N.J. Oct. 24, 1983), Friends of the Earth v. Hintz, 800 F.2d 822 (9 Cir.1986), and Hough v. Marsh, 557 F.Supp. 74 (D.Mass.1982), as examples of cases in which courts have upheld Corps decisions which had examined only those practicable alternatives that were available at the time of the permit review.
 
 
 44
 Our examination of these prior decisions has satisfied us, however, that the issue raised in the instant case simply has not been addressed before. In National Audubon Society, the actual issue was whether the alternative site had to be available to the applicant or any developer. In Hintz, the court, while addressing other issues, simply approved a Corps decision in which only those alternatives available at the time of the review were considered. In Hough, the court invalidated a permit not because the Corps had considered past alternatives but rather because it assumed that such alternatives continued to exist during the entire selection process. Similarly, the Maybank Determination in fact addressed another issue. In the Norden Determination, where about 40 possible alternative sites were identified, of which seven were available at the time of application, EPA did not address the timing issue explicitly, because it was not required to--the presence of the seven currently available alternatives made it unnecessary to reach the issue.
 
 
 45
 We believe that the issue essentially is one of first impression. We view EPA's action in the instant case as an application of the regulatory language to the specific needs of this case which arose here for the first time. We therefore hold that EPA has not acted contrary to prior practice under the regulations.
 
 III.
 
 46
 We turn next to the issue of whether EPA's interpretation of the 404(b)(1) guidelines is entitled to the deference usually accorded an agency with regard to its interpretation of regulations it is charged with administering, see EPA v. National Crushed Stone Ass'n, 449 U.S. 64, 83 (1980), and participated in formulating. See also United States v. Hescorp, Heavy Equip. Sales Corp., 801 F.2d 70, 76 (2 Cir.), cert. denied, 107 S.Ct. 672 (1986). The district court implied in its decision that it was according EPA such deference in examining its market entry approach.
 
 
 47
 Pyramid contends that such deference was unwarranted because two agencies--EPA and the Corps--developed and administered the regulations, and the Corps reached a different conclusion from that of EPA on the market entry issue. It asserts that, contrary to EPA's market entry approach, the "Corps' position is that the availability should be determined as of the time an application is under review." Pyramid points out that under Sec. 404(b) the regulations are to be developed by EPA "in conjunction with" the Secretary of the Army (who acts through the Corps). It cites General Elec. Co. v. Gilbert, 429 U.S. 125, 144-45 (1976), for the proposition that a court must use its own judgment in construing a regulation when two agencies with responsibility for administering it reach divergent conclusions. It also contends that the Corps has greater experience with and expertise in assessing the "availability" of alternatives than EPA, because it is the Corps that makes the initial decision on thousands of applications while EPA reviews under Sec. 404(c) only rarely. Furthermore, Pyramid claims that the availability analysis implicates zoning, economic and financial issues, not environmental ones.
 
 
 48
 In response, EPA asserts that the Corps did not take a developed opposing policy position on the issue of what time is relevant in the "practicable alternatives" analysis. The reason for this is that the Corps, acting through General Wall, based its decision primarily on its finding that Pyramid's mitigation proposal was workable. EPA also asserts, on the issue of its expertise, that its "selective and most infrequent invocation" of its veto power underscores EPA's "seriousness" about using the veto. Finally EPA asserts that the Act's legislative history indicates that Congress intended EPA to have the "final word" on any disputes with the Corps.
 
 
 49
 While none of EPA's assertions is entirely persuasive, there also are difficulties with Pyramid's position. It is undeniable, for example, that Wall in fact did find that the North Attleboro site was "unavailable" and thus it appears that the Corps tacitly was applying a time-of-application test. On the other hand, it is possible that Wall believed that Pyramid did not enter the market until after NED had purchased the North Attleboro site. Accordingly, Wall may have found the alternative site "unavailable" under the market entry approach. Pyramid's and EPA's other arguments similarly cut both ways or are inconclusive.
 
 
 50
 Even if we are not thoroughly persuaded that EPA's interpretation was entitled to deference, however, we nevertheless conclude that the district court's decision in its favor must be upheld. As Pyramid itself points out (to the detriment of its argument), the issue of deference is separate from the issue of the standards of review of the district court and of our Court.
 
 
 51
 On appeal, we must subject the district court's judgment to plenary review, Potenze v. New York Shipping Ass'n, 804 F.2d 235, 239 (2 Cir.1986),cert. denied, 107 S.Ct. 1955 (1987), and apply the same summary judgment test as applied by the district court. See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9 Cir.1987). An agency's interpretation of its own regulations raises a question of law, White Indus. v. FAA, 692 F.2d 532, 534 (8 Cir.1982), and thus is freely reviewable by our Court. Pennzoil Co. v. FERC, 789 F.2d 1128, 1135 (5 Cir.1986).
 
 
 52
 The standard of review for the district court in this case is that the court shall set aside EPA's findings, conclusions or actions only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Administrative Procedure Act Sec. 10(e), 5 U.S.C. Sec. 706(2)(A) (1982). As stated by the Supreme Court in Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29 (1983),
 
 
 53
 "[A] reviewing court may not set aside an agency rule that is rational, based on consideration of the relevant factors, and within the scope of the authority delegated to the agency by the statute.... The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.' "
 
 
 54
 Id. at 42-43 (quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962)).
 
 
 55
 Applying these standards, we are convinced that EPA's market entry interpretation was reasonable, and therefore was neither "arbitrary and capricious" nor "not in accordance with law." We therefore hold that the district court correctly found that EPA's interpretation of the regulations was reasonable.
 
 IV.
 
 56
 Finally, we turn to Pyramid's subordinate claims, three of which warrant brief mention. Pyramid claims (1) that the market entry theory violates administrative law principles because it is not specific enough to put the public on notice of when it must consider alternative sites; (2) that EPA's application of the market entry theory was unfair in this case; and (3) that the district court exceeded its authority in supplying a rationale for EPA's decision which was not offered by EPA.
 
 
 57
 As for the claim that the market entry approach is not specific enough, Pyramid reasons that any number of points in time could constitute "entry" into the market. It speculates whether market entry occurs "from the time the first internal memorandum is written," or the time "the first consultant [is] hired," or the time the "first negotiation for a site [is] conducted." We are persuaded, however, that EPA is correct in asserting that it is unnecessary to pin down the standard to such a degree and that it would confuse things further to attempt to do so. Since the point of "entry" necessarily will vary from case to case, we believe the concept of "market entry" is the best method and is specific enough to put a developer on notice of when it should be considering alternative sites.
 
 
 58
 With regard to the claim that EPA applied the market entry approach unfairly in the instant case, Pyramid asserts that the way EPA announced a "new" standard (the market entry rule) and then applied it "retroactively" in this case was fundamentally unfair. It also asserts that EPA's failure to address evidence that the North Attleboro site was unavailable at the time of Pyramid's market entry was unfair. According to Pyramid, such fundamental unfairness violates the principles underlying the Administrative Procedure Act. See Morton v. Ruiz, 415 U.S. 199, 232 (1974).
 
 
 59
 As we held above, however, we view EPA's interpretation of the rules as a reasonable application of the regulatory language to the unique facts of this case--a case in which it became necessary for the first time to reach the issue of when availability should be determined. EPA did not create and announce a "new" standard and apply it retroactively to Pyramid. Rather, EPA interpreted the law to apply it to the facts of this case.
 
 
 60
 Moreover, we believe the extensive administrative record supports a finding that the North Attleboro site was available to Pyramid when it entered the market. Even if Pyramid were found not to have entered the market until September 1983, after NED had acquired options to purchase the North Attleboro site, it does not necessarily follow that the site was unavailable. Aside from the fact that NED did not acquire all the options for the North Attleboro site until June 1984, it also was possible for Pyramid to attempt to purchase the options from NED. The record shows no such attempts to purchase the site, or even to investigate its availability. Alternatively, even though the district court apparently was not persuaded by it, there also is evidence in the record to show that Pyramid actually entered the market in the Spring of 1983, before NED had purchased its options. Finally, the evidence shows that the North Attleboro site had been available to DeBartolo, Pyramid's predecessor. EPA could reasonably have determined that Pyramid should be held to "stand in the shoes" of DeBartolo, especially since it was able to obtain state approval of the project under the less-stringent state standards that had originally applied to DeBartolo.
 
 
 61
 Finally, Pyramid contends that the district court improperly supplied a rationale for EPA's final determination that EPA itself did not articulate. It is true that the district court rejected one of EPA's grounds for finding that Pyramid had failed to rebut the presumption that a practicable alternative was available. This ground was that the "trade custom" of developers was to investigate a potential development site for many months before purchasing it. EPA reasoned that, if Pyramid had purchased Sweedens Swamp in December 1983, it was unlikely, in view of the trade custom, that it had entered the market only eight weeks earlier--in September 1983--as Pyramid claimed. The court accepted what it characterized as EPA's finding that the North Attleboro site in any event was still available in September 1983, when even Pyramid admitted it had entered the market.
 
 
 62
 Pyramid asserts that EPA did not make this finding and that the court improperly supplied a rationale for EPA's determination that EPA did not articulate itself. This assertion fails, however, because EPA did make the finding. In its final determination it stated several reasons why it believed the North Attleboro site should be deemed to have been "available". It stated, among other things, (1) that NED could "have been talked into relinquishing its interest" in the site even in September or December 1983; (2) that Pyramid never investigated the availability of the North Attleboro site because it believed it was too far from the highway; and (3) that Pyramid had refused to provide EPA with information on the time of its entry into the market, stating that such information "simply does not exist". Thus, the trade custom ground to support the finding of availability was accompanied by several other grounds in the final determination. The district court therefore did not "supply" a rationale for EPA. Rather, EPA supplied several for itself.
 
 
 63
 We affirm the district court's decision in all respects.
 
 V.
 To summarize:
 
 64
 We hold (1) that the market entry theory is consistent with both the regulatory language and past practice; (2) that EPA's interpretation, while not necessarily entitled to deference, is reasonable and its application of its rule is supported by the record; and (3) that Pyramid's other arguments lack merit.
 
 
 65
 Affirmed.
 
 GEORGE C. PRATT, Circuit Judge, dissenting:
 
 66
 Finding that a "common-sense reading" of 33 U.S.C. Sec. 1344(c) "can lead only to the use of the market entry approach", the majority today holds that in determining whether an "alternative is available", EPA is to look, not at the present circumstances and most current data, but rather at circumstances and data which existed, perhaps years earlier, when the developer "entered the market". This market entry theory approaches a sensitive environmental problem through a time warp, it ignores the statute's basic purpose, and it creates unfair and anomolous results. I therefore dissent.
 
 
 67
 I. The Legislative History and Purpose of Section 1344.
 
 
 68
 Section 1344 was enacted by congress in 1972 as part of a broad-based improvement to a national water policy that had been, as congress termed it, "inadequate in every vital aspect." S.Rep. No. 414, 92 Cong., 2d Sess. 7 (1972). Specifically, the section was intended to address the delicate balance between those activities which endanger "marine environment [and] ecological systems" on the one hand, and those activities "essential for the maintenance of interstate and foreign commerce" on the other. Conf.Rep. No. 1236, 92nd Cong., 2d Sess. 43-44 (1972).
 
 
 69
 Section 1344 is unusual: its primary purpose is neither to punish those who illegally infringe on national wetlands, nor, as the majority opines, "to provide an incentive [to developers] to avoid choosing wetlands". To the contrary, the statute is directed at the land itself without any regard to whether the party seeking to develop it has clean hands. Thus, if the "biological integrity" of a specific wetland area outweighs the "interstate and foreign commerce" advantages that the site could provide, the site should remain undeveloped regardless of which developer is seeking the permit. See S.Rep. No. 414, 92nd Cong., 2d Sess. 7 (1972); Conf.Rep. No. 1236, 92nd Cong., 2d Sess. 43-44 (1972). Conversely, if the balance weighs in favor of commerce or other economic advantages, then the land should be developed, again regardless of the specific developer involved. Id. In short, congress designed the section to preserve the environment consistent with reasonable accommodation to the economic and social needs of the public; it was not concerned with the identities or past activities of particular developers.
 
 
 70
 II. The Purpose of Section 1344 and the Market Entry Theory.
 
 
 71
 In this case I have no problem with EPA's basic approach. It conscientiously attempted to weigh the economic advantages against the ecological disadvantages of developing Sweedens Swamp and, in approaching this determination, it properly looked to alternate available sites. However, EPA went wrong--seriously wrong--when it adopted the market entry theory to decide whether an alternate site was available. By focusing on the decisionmaking techniques and tactics of a particular developer, instead of the actual alternatives to disturbing the wetland, EPA ignored the statute's central purpose.
 
 
 72
 The market entry theory in effect taints a particular developer with respect to a particular site, while ignoring the crucial question of whether the site itself should be preserved. Under the market entry theory, developer A would be denied a permit on a specific site because when he entered the market alternatives were available, but latecomer developer B, who entered the market after those alternatives had become unavailable, would be entitled to a permit for developing the same site. In such a case, the theory no longer protects the land, but instead becomes a distorted punitive device: it punishes developer A by denying him a permit, but grants developer B a permit for the same property--and the only difference between them is when they "entered the market".
 
 
 73
 The market entry theory has further problems. In this case, for example, if a Donald Trump had "entered the market" after NED took the option on the North Attleboro site and made it unavailable, under EPA's approach he apparently would have been entitled to a permit to develop Sweedens Swamp. But after obtaining the permit and the land, could Trump then sell the package to Pyramid to develop? Or could he build the mall and then sell the developed site to Pyramid? If, on the one hand, the answer to these questions is "yes", then the market entry theory is no more than a troublesome mirage that could easily be circumvented by Pyramid's using a second party to buy the land and obtain the permit. If, on the other hand, the answer is "no", then Pyramid is forever tainted, forever prohibited--somewhat like a bill of attainder--from owning this particular site, and only because at some time in the past it had "entered the market" while an alternative was still available.
 
 
 74
 Furthermore, in a business that needs as much predictability as possible, the market entry theory will regrettably inject exquisite vagueness. When does a developer enter the market? When he first contemplates a development in the area? If so, in what area--the neighborhood, the village, the town, the state or the region? Does he enter the market when he first takes some affirmative action? If so, is that when he instructs his staff to research possible sites, when he commits money for more intensive study of those sites, when he contacts a real estate broker, when he first visits a site, or when he makes his first offer to purchase? Without answers to these questions a developer can never know whether to proceed through the expense of contracts, zoning proceedings, and EPA applications. Such a vague standard as "market entry" falls far short of the requirement that an agency articulate its standards with sufficient clarity so that the affected community may know what those standards are. See Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Insurance Co., 463 U.S. 29, 48 (1983); Port Terminal Railroad Ass'n v. United States, 551 F.2d 1336, 1344-45 (5th Cir.1977).
 
 
 75
 Even more important, the result reached by EPA and the majority is contrary to what congress sought to achieve when it passed Sec. 1344. Pyramid has been "punished" for beginning its quest when the North Attleboro site was still available; but Sweedens Swamp nevertheless could be destroyed through an identical application by some other developer who happened to enter the market after that alternate site became unavailable. And this would be so even if another, better-suited site should become available after the second developer enters the market, because the "common sense" market entry theory looks only, and blindly, to the alternatives available at the time the applicant "entered the market".
 
 
 76
 III. The Proper Theory for Determining Whether an Alternate Site is Available.
 
 
 77
 Since congress delegated to EPA the responsibility for striking a difficult and sensitive balance among economic and ecological concerns, EPA should do so only after considering the circumstances which exist, not when the developer first conceived of his idea, nor when he entered the market, nor even when he submitted his application; rather, EPA, like a court of equity, should have the full benefit of, and should be required to consider, the circumstances which exist at the time it makes its decision. This is the only method which would allow EPA to make a fully informed decision--as congress intended--based on whether, at the moment, there is available a site which can provide needed economic and social benefits to the public, without unnecessarily disturbing valuable wetlands.
 
 
 78
 Such a "time of decision" theory is reinforced by the present-tense language of the regulation, which commands EPA to determine whether an alternate site "is available". See Gwaltney of Smithfield v. Chesapeake Bay Foundation, 108 S.Ct. 376, 381 (1987) (present tense language in regulation means agency should apply that regulation to present, not past, circumstances). It is also supported by the express statements of congress when it passed the statute, and, I would submit, by true "common sense". Any agency given the unenviable task of balancing essentially incomparable factors in determining what is in the public's best interest, should look to the most up-to-date data, and evaluate the most current circumstances. Any other analysis would effectively tie the agency to an irrelevant date in the past, when the question to be decided is how to balance the environmental and commercial interests of the present and the future.
 
 
 
 [1]
 The amicus curiae, the United States Chamber of Commerce ("Chamber of Commerce") filed a brief in support of Pyramid's position. This brief raises two points also raised in Pyramid's brief, and one new point: that EPA exceeded its authority under Sec. 404(c) by engaging in a de novo review of Pyramid's compliance with the regulation in question
 The Citizens in Support of Attleboro Mall and Joseph Robichaud ("Citizens", collectively) have intervened asplaintiffs/appellants and have submitted a brief raising two issues not covered by Pyramid in its brief: (1) whether EPA exceeded its authority under the relevant statute by considering the historical and cumulative effects of discharges on other wetlands, and (2) whether EPA arbitrarily rejected Pyramid's mitigation efforts.
 The Conservation Law Foundation ("CLF") has intervened as a defendant/appellee and has submitted a brief raising six points, four of which are covered by the Federal Appellees in their brief. In the other two points, CLF: (1) answers the arguments of the Citizens and the Chamber of Commerce, asserting that EPA's decision was wholly within its authority, and (2) asserts that in any event the appropriate remedy for any defects in EPA's decision would be a remand.
 Upon reviewing each of these new points, we hold (1) that EPA's decision was wholly within its authority, and (2) that EPA did not arbitrarily reject Pyramid's efforts at mitigation but rather had ample basis to reject these efforts on the ground that they were not likely to succeed. In light of our holding with regard to the district court's decision, discussed in the body of our opinion, we need not reach the issue of whether remand would be the appropriate remedy for defects in EPA's actions.
 The other arguments of the two intervenors and the amicus will be dealt with in our discussion of the arguments of Pyramid and the Federal Appellees.
 
 
 [2]
 Section 230.10(a)(2) and (3) provide:
 "(a) Except as provided under section 404(b)(2) [pertaining to navigation] no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences.
 * * *
 (2) An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes. If it is otherwise a practicable alternative, an area not presently owned by the applicant which could reasonably be obtained, utilized, expanded or managed in order to fulfill the basic purpose of the proposed activity may be considered.
 (3) Where the activity associated with a discharge which is proposed for a special aquatic site [defined in Subpart E to include wetlands] does not require access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose (i.e., is not "water dependent"), practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise. In addition, where a discharge is proposed for a special aquatic site, all practicable alternatives to the proposed discharge which do not involve a discharge into a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise."
 
 
 [3]
 Section 404(c), 33 U.S.C. Sec. 1344(c), authorizes the Administrator:
 "to prohibit the specification (including the withdrawal of specification) of any defined area as a disposal site, and he is authorized to deny or restrict the use of any defined area for specification (including the withdrawal of specification) as a disposal site, whenever he determines, after notice and opportunity for public hearings, that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas. Before making such determination, the Administrator shall consult with the Secretary. The Administrator shall set forth in writing and make public his findings and his reasons for making any determination under this subsection."