PENNSYLVANIA TROUT, Trout Unlimited–Penns Woods West Chapter, and Citizens for Pennsylvania's Future, Petitioners

v.

DEPARTMENT OF ENVIRONMENTAL PROTECTION and Orix–Woodmont Deer Creek Venture, Respondents.

Commonwealth Court of Pennsylvania.

Argued Oct. 5, 2004.

Decided Dec. 7, 2004.

---

Jody L. Rosenberg, Pittsburgh, for petitioners.

Terry R. Bossert, Harrisburg and Charney Regenstein, Pittsburgh, for respondents.

BEFORE: COHN JUBELIRER, Judge, SIMPSON, Judge, and McCLOSKEY, Senior Judge.

OPINION By Judge SIMPSON.

Pennsylvania Trout, Trout Unlimited–Penns Woods West Chapter and Citizens for Pennsylvania's Future (collectively Objectors) appeal an order of the Environmental Hearing Board (EHB), which upheld the Department of Environmental Protection's (DEP) issuance of a permit to Orix–Woodmont Deer Creek Venture (Permittee) to fill approximately six acres of wetlands so that Permittee may construct a master planned mixed-use commercial development. The EHB determined Permittee met its burden under 25 Pa.Code § 105.18a(b)(3) of rebutting the presumption that a practicable alternative exists to the proposed project that would not involve a wetland or that would have less adverse wetland impact. Because we agree Permittee rebutted the regulatory presumption that a practicable alternative exists, we uphold issuance of the permit.

## I. Statutory and Regulatory Framework

Pursuant to the provisions of the Dam Safety and Encroachments Act (Act),[1] and its attendant regulations,[2] DEP is authorized to regulate the construction, operation, modification or abandonment of any dam, water obstruction or encroachment. *See* Section 6 of the Act, 32 P.S. § 693.6. An "encroachment" is any structure or activity which in any manner changes, expands or diminishes the course of any body of water. Section 3 of the Act, 32 P.S. § 693.3. The term "body of water" includes not only lakes, ponds and reservoirs, but also any "swamp, marsh or wetland." *Id.* Thus, under the Act, DEP regulates and requires permits for any structure or activity that encroaches on a wetland.

In addition to the general criteria for permit issuance under the Act, there are specific requirements for wetlands found in the Act's implementing regulations. *See* 25 Pa.Code §§ 105.17–105.20a. These regulations provide a scheme for the classification of wetlands, and divide wetlands into two categories—"exceptional value wetlands" and "other wetlands." It is undisputed that the wetlands at issue here are "other wetlands."

Under the "Chapter 105" regulations, DEP is required to consider a number of factors in determining whether to issue an encroachment permit. The factors to be applied depend on whether the wetlands at issue are exceptional value or other wetlands. For "other wetlands" a project may be permitted upon a showing that: (i) the project will not have a significant ad-

---

1. Act of November 26, 1978, P.L. 1375, *as amended*, 32 P.S. §§ 693.1–693.27.

2. *See* 25 Pa.Code §§ 105.1–105.451.

verse impact on the wetland; (ii) any adverse impacts are reduced to the maximum extent possible; (iii) there is no practicable alternative to the project; (iv) the cumulative effect of the proposed project, together with other projects, will not result in a major impairment of the Commonwealth's wetland resources; and (v) affected wetlands will be replaced. *See* 25 Pa.Code § 105.18a(b).

The sole factor at issue here is the "no practicable alternatives test." It provides, in relevant part:

> (b) Other wetlands.... [DEP] will not grant a permit under this chapter for a ... water obstruction or encroachment in, along, across or projecting into the wetland ... unless the applicant affirmatively demonstrates in writing and [DEP] issues a written finding that the following requirements are met:
>
> * * * *
>
> (3) There is no practicable alternative to the proposed project that would not involve a wetland or that would have less adverse impact on the wetland, and that would not have other significant adverse impacts on the environment. An alternative is practicable if it is available and capable of being carried out after taking into consideration construction cost, existing technology and logistics. An area not presently owned by the applicant which could reasonably be obtained, utilized, expanded or managed to fulfill the basic purpose of the proposed project shall be considered as a practical alternative.
>
> (i) It shall be a rebuttable presumption that there is a practicable alternative, not involving a wetland, to a non-water-dependent project, and that the alternative would have less adverse impact on the wetland.
>
> (ii) To rebut the presumption, an applicant ... shall demonstrate with reliable and convincing evidence and documentation and [DEP] will issue a written finding that the following statements are true:
>
> (A) The basic project purpose cannot be accomplished utilizing one or more other sites that would avoid, or result in less, adverse impact on the wetland.
>
> (B) A reduction in the size, scope, configuration or density of the project as proposed and alternative designs to that of the project as proposed that would avoid, or result in fewer or less severe, adverse impacts on a wetland will not accomplish the basic purpose of the project.

25 Pa.Code § 105.18a(b)(3). This regulation establishes a rebuttable presumption for DEP that, where a proposed project is not water dependent, a practicable alternative exists. 25 Pa.Code § 105.18a(b)(3)(i), (ii). To rebut the presumption, an applicant must submit reliable and convincing evidence to DEP that no practicable alternative is available. An alternative is "practicable" if "it is available and capable of being carried out after taking into consideration construction cost, existing technology and logistics." 25 Pa.Code § 105.18a(b)(3).

## II. Factual Background

Permittee seeks to construct a 1.2 million square foot commercial development on 245 acres of undeveloped land in Harmar Township, Allegheny County. The property at issue is bordered on the east by the Pennsylvania Turnpike, on the south by Pennsylvania Route 28 and is bisected by Pennsylvania Route 910.

Permittee applied to DEP for an encroachment permit to fill 6.17 acres of wetland and to divert 2,700 feet of Deer Creek around its proposed commercial development. DEP denied the application primarily because of stream and wetland

impacts. In addition, DEP determined Permittee did not adequately explore the availability of off-site alternatives. After filing and withdrawing an appeal, Permittee submitted a second application, which is the subject of this appeal.

Through its second application, Permittee sought authorization to place fill within the flood plain of Deer Creek and to encroach on 5.96 acres of wetland. Permittee no longer proposed to relocate Deer Creek. Notably, in its second application, Permittee included an extensive "alternatives analysis." After reviewing and investigating the second application, DEP issued the permit. Objectors appealed to the EHB.

The second application was a joint application to DEP and the United States Army Corps of Engineers. The Corps of Engineers issued its encroachment permit for the project at about the same time as DEP.

### III. EHB Hearings

During eight days of hearings before the EHB, thirteen witnesses testified. A summary of the pertinent testimony follows. Nancy Rackham is a water pollution biologist employed by DEP. Rackham's primary job responsibility is reviewing permit applications for wetland and stream encroachments. Rackham reviewed both permit applications submitted by Permittee. According to Rackham, DEP denied Permittee's first application primarily because of the proposed stream and wetland impacts. In addition, Rackham believed Permittee did not adequately explore the availability of off-site alternatives in its first application. In its first application, Permittee proposed filling six of the seven wetlands on the site leaving only "wetland number 7" remaining. Permittee only proposed to impact 5.96 acres of wetlands in its second permit application. Another

significant change in the second application was that Permittee no longer proposed to relocate Deer Creek.

Rackham indicated Permittee selected the Deer Creek site because it served its "basic project purpose," which was to construct a large commercial mixed-use center. According to the application and Rackham's investigation and review, Permittee chose the Deer Creek site because it identified an underserved market area. Through a process of elimination, Permittee reviewed and rejected other sites because they did not adequately serve the project purpose. Permittee informed Rackham it needed to develop a one to two million square foot regional shopping center based on the requirements necessary to obtain Tax Increment Financing (TIF) to help finance the proposed development.

Rackham and others at DEP asked extensive questions concerning the alternatives analysis submitted with the second application. She testified DEP did not limit its review to sites that would support a one to two million square foot development. In fact, Rackham explained, in performing the alternatives analysis for its second application, Permittee considered sites as small as 100 acres at DEP's request. Rackham testified Permittee evaluated 30 parcels in its alternatives analysis. Permittee used excessive site costs as one basis for excluding a site as being a practicable alternative to the Deer Creek site. Two other criteria were highway visibility and major highway access. Ultimately, Rackham concluded Permittee rebutted the presumption that there was a practicable alternative to the selected site. She made a written finding of her conclusion.

The DEP engineer assigned to review the second permit application was Chris Kriley, P.E. Kriley reviewed the engineering sections of the second application, including the hydrologic and hydrology

analyses, the general site plan, and the traffic studies. Kriley noted the second application included an appendix, entitled "Analysis of Practical Alternatives," which contained detailed information about alternative sites, including information regarding ownership and availability of various parcels. Also, the second application included an appendix, entitled "Concept Plans," which set forth a summary and evaluation for "on-site alternatives" to the proposed project.

Kriley further explained, as part of the proposed development, Permittee would construct replacement wetlands on the project site and in an off-site area. The proposed replacement wetlands were designed to provide filtration of contaminants before water enters Deer Creek. Also, the proposed development avoids substantially impacting wetland number 7, which is one of the most highly functional wetland on the site. In addition, Permittee proposed to construct a 93–acre conservation easement. Permittee also proposed a wetlands enhancement program in which some of the invasive plant species would be eliminated and more beneficial species would be planted. Ultimately, Kriley recommended DEP approve Permittee's second application.

Objectors presented expert testimony by Patrick Phillips (Objector's expert), an expert in economic, commercial and retail development. Notably, he recently worked as a consultant for the Mills Corporation, a commercial developer seeking to construct a retail development along the "Route 28 corridor." That competing development is approximately 1½ miles from the Deer Creek site. While working for the Mills Corporation, Objector's expert prepared an alternatives analysis in which he concluded there were no practicable alternatives to the site selected by Mills.

Objector's expert reviewed the alternatives analysis submitted by Permittee in both its first and second applications. He indicated the criteria utilized by Permittee in its alternatives analysis submitted with its second permit application were "logical and rational." EHB Adj., Finding of Fact (F.F.) No. 233.

With regard to on-site alternatives, Objector's expert opined that Permittee could construct its project solely to the west of Route 910 and still have a viable project without adversely impacting the wetlands. However, Objector's expert was unable to identify any viable off-site alternative for Permittee's proposed project. F.F. No. 251.

Of further import here, the EHB made a specific finding that Objectors did not present the expert testimony of Thomas Bartnik, who was listed in Objectors' prehearing memorandum as an expert to testify concerning Permittee's alternatives analysis.

Permittee presented testimony by Stephen Coslik, Chairman and CEO of the Woodmont Company, who testified as both a fact witness and an expert in commercial retail development. Coslik testified Woodmont first became involved in the Pittsburgh area in 1995 and discovered the area was underserved by national retailers. After talking to customers and investigating the Pittsburgh area, Woodmont focused on the Upper Allegheny Valley. It saw a need to develop a site of approximately one million square feet. Woodmont located the Deer Creek site in 1996 though their real estate consultant. During the second application process, Permittee searched diligently for a practicable alternative to the Deer Creek site. Coslik indicated it was in the company's best interests to find such a site to meet its project purpose if the site had less environmental "problems." Such a site would

allow Permittee to construct its development more quickly and more economically. After investigating potential alternatives, Permittee ultimately concluded no practicable alternative site existed.

In addition, Permittee presented testimony by members of the "team" of expert consultants who performed the alternatives analysis, including a civil engineer, a commercial real estate consultant and a biologist. Thus, Permittee presented testimony by Greg Sheffler, P.E., a civil engineer, whose company acted as the project coordinator for the permit application. Sheffler's company worked on the off-site and on-site alternatives analysis, prepared site and grading plans, prepared hydrologic and hydrology studies, and assisted other consultants in preparing design plans, including wetland replacement plans.

With regard to off-site alternative areas, Sheffler indicated after potential sites were identified a field investigation of each site was performed. As DEP reviewed the application, Sheffler's company coordinated responses to specific questions raised by DEP. Sheffler indicated the second permit application provided for 107 acres of "flat pad" (building pad area and parking area), while the first application provided for 123 acres. Sheffler disagreed with Objectors' expert that the area to the west of Route 910 could be economically developed. Significantly, the EHB found Sheffler more credible than Objectors' expert on that issue. F.F. No. 302.

## IV. EHB Adjudication

Before the EHB, Objectors questioned whether Permittee rebutted the regulatory presumption that there are practicable alternatives with less adverse wetland impact. They also argued the "basic purpose" of the project was too narrow and specific. In addition, they asserted DEP's approval of the Permit did not comply with applicable regulations.

The EHB issued a 67–page adjudication, consisting of 334 findings of fact, 22 pages of discussion and 19 conclusions of law. After outlining the relevant evidence set forth above, the EHB made the following significant findings:

311. [DEP] prepared a detailed permit review summary that evaluated and reached conclusions on all essential elements of the application and the regulations. (Ex. C–1)

\* \* \* \*

313. [Permittee's] Alternatives Analysis included the accumulated work of engineers, [an] ecologist and real estate professionals retained to study potential alternative sites. (Transcript pages 773–776, 801–803, 818–825)

314. As part of its Alternatives Analysis [Permittee] evaluated 30 different sites within a corridor one mile on either side of Route 28 from Fox Chapel to Tarentum, a distance of approximately 10 miles. (Joint Stipulation # 14; Ex P–3; Transcript page 661)

315. [Permittee] provided extensive documentation to [DEP] relating to its evaluation of both the target market Exhibit P–7, (Volume 2, "Addendum 3") . . . and the viability of potential alternative sites. (Ex. 3; Transcript pages 819–820)

316. [DEP] sent several review letters that raised questions regarding the Alternatives Analysis and [Permittee] provided answers to those questions. (Joint Stipulation # 23; Ex. C–6; C–7; P–28; Transcript pages 1085–1087)

317. [Objectors] presented no evidence refuting the conclusions drawn by [Permittee] in its Alternative Analysis in Exhibit P–3 and P–7.

318. [Permittee] undertook appropriate and reasonable efforts to determine whether there were available practicable alternatives to the site in question. (Ex. P–3)

319. Environmental professionals hired by [Permittee] spent several months of field and office time evaluating the potential alternative sites. (Transcript pages 773–776, 801–803, 818–825)

\* \* \* \*

324. [Permittee] used reasonable and prudent measures to determine the availability of properties throughout the study area. (Transcript page 1001)

325. The original application called for the encroachment on 6.17 acres of wetland. The site plan submitted with [the second application] called for an encroachment on 5.89 acres of wetland and the creation of 7.17 acres of mitigation wetland. The [second] application also eliminated any relocation of Deer Creek. (Ex. C–1; C–2)

326. The area bordering the north bank of Deer Creek contains 4.35 acres of wetlands and the application proposed the creation of 4.46 acres of replacement wetlands also along the north bank of Deer Creek within the flood plain of the creek. (Ex. P–14; P–14A; Transcript pages 805–806)

327. On the south bank of Deer Creek Wetland # 4 is not being impacted. The project as permitted will retain that area and add an additional 1.03 acres of wetland in the same area. (Ex. P–14 (Wetland Impact Summary); Transcript pages 810–811)

328. The project was designed to minimize to the greatest extent possible the amount of encroachment onto Deer Creek Wetland # 7, the largest and highest quality wetland on site. (Transcript page 355) Only 0.18 acres out of 3.75 acres is impacted. (Transcript pages 812–813)

329. The wetlands in question on the project site are of limited function and value, having been impacted by activities unrelated to this project including, but not limited to, highway construction and construction of a municipal sewer line. (Ex. E–1; Transcript pages 169–171, 334–335)

330. The replacement wetlands provided by [Permittee] will provide the same or superior function and value to those being impacted as a result of the project. (Transcript pages 1701–171, 334, 808–810)

F.F. Nos. 311, 313–319; 324–330.

The EHB first determined that Objectors as third-party appellants bore the burden of proving DEP abused its discretion in issuing the Permit. 25 Pa.Code § 1021.122(c)(3). The EHB next discussed the application of the regulatory presumption to the facts presented.

The EHB noted the required "alternatives analysis" contemplates an applicant (i) conduct a search for other locations, i.e., off-site alternatives (25 Pa.Code § 105.18a(b)(3)(ii)(A)); and (ii) determine whether changes can be made to the project on the proposed site to eliminate or reduce the impact on the wetlands, i.e., on-site alternatives (25 Pa.Code § 105.18a(b)(3)(ii)(B)).

With regard to on-site alternatives, the EHB determined the evidence did not show any further reduction in size to the project could reduce the environmental impact on the site while maintaining it as a viable project. Also, the EHB evaluated DEP's efforts. Particularly significant in this regard was DEP's determination that Permittee minimized the adverse impacts to the maximum extent possible; through its two applications, Permittee proposed a total of twelve on-site alternatives in an

effort to reduce the impact on the wetlands; and DEP required numerous on-site changes to further reduce the adverse impacts, with which Permittee complied.

With regard to off-site alternatives, the EHB began by noting, any practicable alternatives that would rebut the regulatory presumption must meet the "basic purpose" of the project. The EHB noted Permittee clearly and succinctly articulated the project's purpose as a large master planned mixed-use commercial development. It also justified its need for such a large site. The EHB noted Permittee conducted an "exhaustive search" for other practicable alternatives by performing a detailed analysis of 30 parcels. Concluding DEP properly determined Permittee's "alternatives analysis" was sufficient, the EHB stated:

> Not only did [DEP] require [Permittee] to revise its site plans multiple times to reduce impacts on aquatic natural resources, including the wetlands[,] but the acreage of the impacted wetlands was actually decreased and the largest and best functioning wetland, number 7, was protected and enhanced. [DEP] also required [Permittee] to conduct a thorough and complete analysis of alternative sites that would eliminate or reduce wetland impacts. The analysis of alternative sites presented by [Permittee] was questioned extensively by [DEP] and nothing was accepted at face value.
>
> In fact, we are under [the] distinct impression that since [DEP] had denied the first application it was not convinced [Permittee] would undertake the near

Herculean study of alternative sites that it in fact did. [DEP] knew that a denial of the permit application would surely be appealed and so it made sure that every avenue was covered. . . .

EHB Adj. at 62. Consequently, the EHB upheld DEP's issuance of the Permit.

■ This appeal by Objectors followed.[3] Although Objectors raise an abundance of points, they basically assign six errors. They assert the EHB erred in: failing to protect the wetlands by sustaining their challenge; misapplying the burden of proof; declining to exercise its required *de novo* review; misinterpreting the practicable alternatives regulation; determining Permittee rebutted the presumption that there are practicable "off-site" alternatives; and concluding Permittee rebutted the presumption that a practicable "on-site" alternative exists.

■ At the outset, we note that questions of resolving conflicts in the evidence, witness credibility, and evidentiary weight are within the exclusive discretion of the EHB, the fact finding agency, and are not matters for a reviewing court. *Leatherwood, Inc. v. Dep't of Envtl. Prot.*, 819 A.2d 604 (Pa.Cmwlth.2003). Thus, we will examine, but not weigh evidence because the EHB, as fact-finder, is in a better position to find facts based on the testimony and demeanor of the witnesses. *Id.* In addition, we may not substitute our judgment for that of the EHB. *Id.*

## V. Importance of Wetlands

■ Preliminarily, Objectors discuss the environmental importance of wetlands and

---

3. Permittee initially filed a cross-appeal challenging Objectors' standing to appeal (Dkt. No. 1045 C.D. 2004). However, Permittee subsequently discontinued that cross-appeal. Permittee's Br. at 4.

Our review of an EHB order is limited to determining whether the EHB's findings are supported by substantial evidence and whether constitutional violations or errors of law were committed. *Leatherwood, Inc. v. Dep't of Envtl. Prot.*, 819 A.2d 604 (Pa.Cmwlth. 2003).

assert the EHB's failure to sustain their challenge to the issuance of the permit removes the only regulatory safeguard protecting the wetlands from destruction. We disagree.[4]

■ This argument fails since the EHB made several findings that undermine Objectors' assertion. Specifically, the EHB found the wetlands which will be impacted by the proposed project are of limited function and value. F.F. No. 329. In addition, the EHB found Permittee would take several important measures to enhance the area by constructing replacement wetlands of function superior to the existing wetlands. F.F. Nos. 330–31. The EHB further found Permittee would preserve wetland number 7, the highest quality wetland on the site. F.F. No. 328. These findings are supported by the testimony of DEP biologist Nancy Rackham, and Permittee's ecologist, Patrick Gavaghan. Reproduced Record (R.R.) at 454a, 499a 664–65a. Objectors presented no expert evidence to contradict this testimony. Therefore, even if properly preserved below, Objectors' argument fails.

## VI. Burden of Proof/ *De Novo* Review

### A.

Objectors next argue the EHB erred by misapplying the burden of proof. Despite acknowledging that, as third-party appellants, they bore the burden of proving DEP erred, Objectors assert Permittee also bore the burden before the EHB since there is a regulatory presumption that a practicable alternative exists. Objectors contend, unlike third party appeals where no such presumption exists, any uncertain-

ty here weighs against the permittee, not the challenger.

■ The applicable burden of proof is set forth in the EHB's regulations, which state, in relevant part:

> In proceedings before the EHB, the burden of proceeding and the burden of proof shall be the same as at common law in that the burden shall normally rest with the party asserting the affirmative of an issue. It shall generally be the burden of the party asserting the affirmative of the issue to establish it by a preponderance of the evidence....

25 Pa.Code § 1021.122(a). Further, "[a] party appealing an action of [DEP] shall have the burden of proof ... [w]hen a party who is not the recipient of an action by [DEP] protests the action." 25 Pa. Code § 1021.122(c)(2). Thus, a party protesting DEP's issuance of a permit has the burden to show, on the record produced before the EHB, issuance of the permit was arbitrary or was an abuse of discretion. *Concerned Residents of the Yough (CRY), Inc. v. Dep't of Envtl. Res.*, 162 Pa.Cmwlth. 669, 639 A.2d 1265 (1994).

■ After the protesting party produces evidence that issuance of the permit was erroneous, the burden of production shifts to DEP to justify issuance of the permit, but only after the protesting party presents evidence showing a likelihood of environmental harm. However, the ultimate burden of proof remains at all times with the protesting party. *Pennsylvania Game Comm'n v. Dep't of Envtl. Res.*, 97 Pa. Cmwlth. 78, 509 A.2d 877 (1986).

---

4. Chapter 105 regulations contain several provisions that relate to the protection of wetland resources, including water quality and environmental issues. *See* 25 Pa.Code 105.18a(b)(1), (2), (4), (5). Objectors did not challenge Permittee's compliance with any of these regulatory provisions before the EHB. Therefore, Objectors waived this issue. *Tri–State Transfer Co., Inc., v. Dep't of Envtl. Prot.*, 722 A.2d 1129 (Pa.Cmwlth.1999). Moreover, as discussed, this argument lacks merit.

██ Contrary to Objectors' assertion, the regulation creates a rebuttable presumption that operates at the administrative level, that is, in the proceedings with DEP to obtain a permit. *See* 25 Pa.Code § 105.18a(b)(3). No language in the regulation addresses proceedings beyond issuance of a permit by DEP. *Id.* Therefore, the regulation does not modify the burden of proof before the EHB.

On appeal to the regulatory tribunal, the EHB, its regulation applies to place the burden on third-party appellants. *See* 25 Pa.Code § 1021.122(c)(2). Thus, as the party protesting issuance of the permit, Objectors were required to come forward with evidence to show, on the record before the EHB, issuance of the permit was arbitrary or amounted to an abuse of discretion. *Leatherwood; Concerned Residents of the Yough, Inc.* The EHB correctly applied that burden here, and we reject Objectors' arguments to the contrary.

**B.**

Objectors further assert the EHB erred in failing to conduct *de novo* review. Objectors contend the EHB should conduct an extensive review as was done in *Leatherwood* after DEP granted a landfill permit. Here, they contend, the EHB failed to thoroughly evaluate DEP's action.

 Objectors correctly assert that, when an appeal is taken from DEP to the EHB, the EHB is required to conduct a hearing *de novo*. *Warren Sand & Gravel Co., Inc. v. Dep't of Envtl. Res.*, 20 Pa. Cmwlth. 186, 341 A.2d 556 (1975). The EHB is not an appellate body with a limited scope of review attempting to determine if DEP's action can be supported by the evidence received at DEP's fact-finding hearing. *Id.* Rather, the EHB's duty is to determine if DEP's action can be sustained or supported by the evidence taken by the EHB. *Dep't of Envtl. Prot. v.*

*N. Am. Refractories Co.*, 791 A.2d 461 (Pa.Cmwlth.2002) (EHB adjudicates matters in the first instance; it does not function as an appellate body).

 Contrary to Objectors' assertions, however, the EHB properly exercised its required *de novo* review here by considering the case anew, and rendering its decision based upon the evidence it received. Specifically, the EHB based its decision on the permit application materials submitted to DEP, the testimony of DEP personnel who reviewed the application, the testimony of Permittee's team of experts who performed the alternatives analysis, and the evidence submitted by Objectors. By considering the case anew based upon the evidence it received, the EHB conducted the required *de novo* review.

Moreover, *Leatherwood* does not support relief here. In that case, DEP issued a permit to construct and operate a landfill near an airport. Following an appeal by objectors, the EHB revoked the permit because it was issued without an analysis of and remedy for a known risk to aircraft in the vicinity of the landfill. The objectors presented credible expert evidence on the issue, and DEP acknowledged its fault. We affirmed revocation of the permit.

Here, unlike in *Leatherwood*, Permittee submitted an extensive alternatives analysis, which was carefully evaluated by DEP. Based upon its independent consideration of the evidence, the EHB determined DEP did not abuse its discretion. Further, unlike the objectors in *Leatherwood*, the Objectors here failed to produce any credible expert evidence to prove DEP error. F.F. Nos. 251, 317. Finally, DEP does not acknowledge an inadequate review.

**VII. Interpretation of the Alternatives Analysis Regulation**

**A.**

Objectors also argue the EHB's interpretation of the alternatives analysis regu-

lation is flawed because it is inconsistent with prior EHB precedent. Specifically, Objectors maintain the EHB's adjudication conflicts with its prior decision in *N. Pocono Taxpayers' Ass'n v. Dep't of Envtl. Res.*, 1994 EHB 449 (1994). This argument fails.

First, *N. Pocono Taxpayers' Ass'n*, a decision of the EHB, is not binding on this Court. *See, e.g., Dep't of Envtl. Res. v. Pennsylvania Mines Corp.*, 102 Pa.Cmwlth. 452, 519 A.2d 522 (1986) (EHB decisions have no precedential value in this Court).[5]

Second, *N. Pocono Taxpayers' Ass'n* is factually distinguishable. There, the EHB determined DEP's predecessor agency, the Department of Environmental Resources (DER), erred in determining an applicant's alternatives analysis was adequate. The analysis was inadequate because the applicant could not substantiate its elimination of alternative parcels with supporting data. Specifically, the EHB stated:

> For DER to be satisfied that the practicable alternative site elimination process has been properly carried out requires the submission of this data to DER for its review. *According to the [applicant's] own witness who helped it in site selection, that was not done. On the basis of the failure to submit such data to DER, we must conclude any decision by DER to issue this permit was based on an inadequate justification of use of the site.*

1994 WL 131561 at *23 (emphasis added).

Unlike the applicant in *N. Pocono Taxpayers' Ass'n*, here Permittee provided DEP with a thorough alternatives analysis in which it evaluated 30 potential sites.

Permittee supplied data necessary to determine why it eliminated alternative sites. Further, DEP questioned Permittee extensively concerning the adequacy of its alternatives analysis, and Permittee responded in a manner which satisfied DEP that no practicable alternative existed. Finally, before the EHB, Permittee presented testimony by its team of experts who performed the alternatives analysis. These witnesses explained the detailed process to exclude alternative parcels as impracticable. Because it is factually distinguishable, *N. Pocono Taxpayers' Ass'n* is not in conflict with the EHB's decision here.

### B.

Objectors further contend the EHB erred in considering Permittee's alternatives analysis because it was conducted more than five years after the project site was selected. This argument lacks merit.

In *Leatherwood*, we addressed a similar timing argument challenging the competency of evidence supporting the EHB's decision. The applicant assigned error to consideration of a hazard remedy plan that became available after DEP issued the initial permit but before the landfill was allowed to open. We disagreed, stating:

> [T]he EHB determines *from the evidence it receives* whether DEP's action can be sustained. Where the EHB finds DEP abused its discretion, it may substitute its discretion for that of DEP and order the relief requested. . . .

Here, information relating to the bird hazard generated any time before action on Leatherwood's Bird Control Plan was relevant to the Plan's efficacy. Because the evidence was relevant, the EHB did

---

**5.** We are mindful, however, that while an administrative agency is not bound by its prior precedent, it must render consistent opinions and should either follow, distinguish or

overrule its own precedent. *See Bell Atl. v. Pub. Util. Comm'n*, 672 A.2d 352 (Pa.Cmwlth. 1995).

not exceed the scope of its *de novo* review by considering evidence which became available after DEP issued the executory [p]ermit, but before approval of the Bird Control Plan.

*Leatherwood,* 819 A.2d at 611–12 (emphasis added) (citations omitted). *See also Pequea Township v. Herr,* 716 A.2d 678 (Pa.Cmwlth.1998) (holding the EHB may substitute its discretion for that of DEP, and modify DEP's action based on the evidence before it); *Warren Sand & Gravel* (affirming the EHB's modification of permit conditions imposed by DER based on evidence submitted to the EHB).

▉ Based on *Leatherwood,* in order to raise an objection to the competency of the evidence, it should appear the information was not available and used during the permit process before DEP. *Id.* Here, however, information concerning the alternatives analysis was available and used during the permit process before DEP. Indeed, Permittee submitted the identical alternatives analysis to DEP as it did to the EHB. Consequently, Objectors' claim that the alternatives analysis should be disregarded because it was undertaken after site selection lacks merit. Moreover, Objectors' additional arguments arising from the timing of the alternatives analysis address the weight rather than the competency of the evidence, a matter reserved solely for the EHB as fact-finder. *Leatherwood.* For these reasons, we discern no error.[6]

## VIII. "Off–Site" Alternatives

Objectors next contend the EHB erred in determining Permittee rebutted the presumption that a practicable "off-site" alternative exists. *See* 25 Pa.Code § 105.18a(B)(3)(ii)(A) (applicant must prove it cannot accomplish its basic project purpose by utilizing one or more sites that would result in less wetland impact). Specifically, they assert the EHB erred in: (a) declining to question the "basic project purpose"; (b) determining the geographic range for off-site alternatives was not arbitrarily drawn; (c) determining the 100–acre minimum parcel size requirement was an appropriate screening criteria; (d) failing to evaluate Permittee's site selection criterion; and, (e) failing to independently evaluate the availability of a nearby site currently utilized by one of Permittee's competitors as a mixed-use commercial development.

### A.

Objectors argue the EHB erred in declining to question Permittee's "basic project purpose," which was necessary to define the realm of alternatives to be considered. They assert DEP and the EHB afforded Permittee unbridled discretion in defining the project's purpose, thereby allowing Permittee to exclude practicable off-site alternatives.

DEP responds the practicable alternatives regulation does not vest it with authority to review and modify an applicant's basic project purpose; rather, its power is limited to determining whether an appli-

---

6. Objectors rely on *Bersani v. Robichaud,* 850 F.2d 36 (2d Cir.1988), in which the Second Circuit Court of Appeals upheld the Environmental Protection Agency's (EPA) application of the "market entry" theory of alternative site availability. However, *Bersani* does not compel a different result here. In that case, the EPA found an alternative site was available when the applicant entered the market, but it became unavailable by the time of permit application. *Id.* at 38. In contrast, here the EHB found no alternative site available at any time, and it therefore was not required to consider a universal rule on the timing of alternative site availability. Moreover, the Court of Appeals referenced several cases similar to the present controversy where EPA took a different approach. *Id.* at 44–45.

cant satisfies the regulatory review criteria. DEP contends, consistent with the plain language of the regulation, it is the applicant who identifies the project it wishes to build, not DEP.

 The "basic project purpose" language is found in both the "off-site" and "on-site" components of the alternatives analysis regulation. The "off-site" component states "[t]o rebut the presumption [that a practicable alternative exists], *an applicant ... shall demonstrate ... the basic project purpose* cannot be accomplished utilizing one or more other sites that would avoid, or result in less, adverse impact on the wetland." 25 Pa.Code § 105.18a(b)(3)(ii)(A) (emphasis added). This regulation requires *an applicant* demonstrate that its basic project purpose cannot be accomplished utilizing one or more other sites that would result in less adverse wetland impact. Because it is the applicant who proposes the project, it is the applicant who defines its purpose. Although the project purpose cannot be a pretext to exclude undesirable site alternatives, an applicant may pursue any reasonable definition of project purpose, subject to robust inquiry by DEP.

While our research reveals no Pennsylvania cases interpreting the "basic project purpose" language, our interpretation is consistent with federal case law interpreting the Clean Water Act (CWA)[7] and its attendant regulations, which contain simi-

lar permitting requirements for the filling of wetlands.

Federal cases interpreting the "overall project purpose" language[8] hold that the Corps may not manipulate a project's purpose so as to exclude alternative sites. Rather, the Corps has a duty to take into account the objectives of the applicant's project. *See Greater Yellowstone Coalition v. Flowers*, 359 F.3d 1257 (10th Cir. 2004); *Sylvester v. United States Army Corps of Eng'rs*, 882 F.2d 407 (9th Cir. 1989); *Friends of the Earth v. Hintz*, 800 F.2d 822 (9th Cir.1986); *Northwest Envtl. Defense Ctr. v. Wood*, 947 F.Supp. 1371 (D.Or.1996). "Indeed, it would be bizarre if the Corps were to ignore the purpose for which applicant seeks a permit and to substitute a purpose it deems more suitable." *Louisiana Wildlife Fed'n, Inc. v. York*, 761 F.2d 1044, 1048 (5th Cir.1985).

An issue similar to that raised by Objectors here faced the Ninth Circuit Court of Appeals in *Sylvester*. There, the Ninth Circuit responded to an objector's claim that the Corps impermissibly accepted a developer's defined purpose for its resort complex as necessitating an on-site golf course. By accepting the developer's project purpose, the objector argued, the Corps' evaluation of practicable alternatives was improperly skewed in favor of the developer. The Court of Appeals rejected the claim, stating:

---

7. *See* 33 U.S.C. §§ 1251–1387.

8. Specifically, Section 404 of the CWA, 33 U.S.C. § 1344, prohibits filling waters of the United States, including wetlands, without a permit from the United States Army Corps of Engineers (Corps) authorizing the fill activity. 33 U.S.C. § 1344(a), (d). The Corps may not issue a fill permit "if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem." 40 C.F.R. § 230.10(a). A "practicable" alternative is one that is "avail-

able and capable of being done after taking into consideration cost, existing technology, and logistics *in light of overall project purposes.*" 40 C.F.R. § 230.10(a)(2) (emphasis added).

Thus, under the federal "practicable alternative" regulation, when investigating practicable alternatives, the Corps must first determine the "overall project purposes." 40 C.F.R. § 230.10(a)(2); *Northwest Envtl. Defense Ctr. v. Wood*, 947 F.Supp. 1371 (D.Or. 1996).

Obviously, an applicant cannot define a project in order to preclude the existence of any alternative sites and thus make what is practicable appear impracticable. This court in *Hintz* quite properly suggested that the applicant's purpose must be 'legitimate.' Yet, in determining whether an alternate site is practicable, *the Corps is not entitled to reject [the developer's] genuine and legitimate conclusion that the type of golf course it wishes to construct is economically advantageous to its resort development. ...*

*Sylvester*, 882 F.2d at 409 (emphasis added). Because the applicant's project purpose was legitimately drawn, the Court determined the Corps did not have authority to reject it.

■ Here, as in *Sylvester*, we believe Permittee set forth a legitimate project purpose which was not drawn to exclude practicable alternatives. Permittee's basic project purpose was to construct a large commercial mixed use center. F.F. No. 122. The EHB determined Permittee adequately explained its rationale for constructing a large commercial development, stating:

[Permittee] entered Western Pennsylvania at the request of one its retail clients. It discovered that the Pittsburgh area was relatively underserved and there were several national retailers who were either not present or had a minimal presence. It proceeded to investigate the market and eventually developed several retail developments.

At the same time it became convinced that the Allegheny Valley portion of the market was vastly underserved from a retail perspective. This is exactly the same conclusion reached by it[s] competitor ... and [Objector's expert]. It envisioned a mixed use, master planned commercial development, of approximately one million square feet. [Permittee] ... subscribe[s] to the retail theory that combining different uses, such as retail, office, and entertainment, in a single commercial center creates 'synergy' between the uses and a successful development....

EHB Adj. at 60. Further, DEP "pushed, prodded, cajoled and otherwise forced" Permittee to articulate its basic project purpose and justify the size of the development, and Permittee did so "clearly and succinctly." *Id.* In contrast, Objectors failed to prove the project purpose was unreasonably narrow. Because Permittee set forth and defended a legitimate project purpose, there was no error in DEP's acceptance of it.

Moreover, Objectors' assignment of error misperceives both the nature of the inquiry and the process by which issues are resolved. The "basic purpose" of a project will vary in each case. It is, therefore, a question of fact.

These facts are resolved in the first instance by the administrative agency having expertise in the subject matter, here DEP. On appeal, the facts are found by a regulatory tribunal which also enjoys expertise in the subject matter. The fact-finding process before the tribunal embraces the "testing" procedures commonly found in litigation. These include opportunities for objectors to confront and cross-examine evidence concerning the criteria used in an alternatives analysis. Further, objectors may introduce conflicting evidence. All these facets of the fact-finding process occurred here.

Ultimately, the fact-finding tribunal must decide which evidence to accept. As here, a determination supported by substantial evidence will not be disturbed.

## B.

Objectors further assert the EHB erred in failing to determine the geographic range of Permittee's off-site alternatives analysis was arbitrarily drawn. They argue that, because Permittee could satisfy its project purpose by building its development within a wider region than that considered in the alternatives analysis, the "off-site" alternatives analysis is inadequate.

 Contrary to Objectors' assertions, the record contains detailed explanations for Permittee's decision to select northeastern Allegheny County for its commercial retail development. These include: (i) the area is underserved with retailers; (ii) consumer demand exists in the area; (iii) national retailers expressed significant interest in locating stores in the area; (iv) the availability of financial and tax incentives; (v) visibility from major highways; and (vi) proper zoning conditions for commercial development. R.R. at 611a–614a. In light of the substantial evidence supporting Permittee's legitimate reasons for choosing to locate its project in northeastern Allegheny County, we discern no error in this regard.[9]

## C.

 Objectors also contend the EHB erred in determining Permittee's use of a 100–acre minimum size requirement was a reasonable screening criterion. They argue the existence of demand in the area and the need of a certain size to obtain Tax Increment Financing (TIF) do not justify use of the minimum size requirement.

This argument overlooks the EHB's findings.

First and foremost, the EHB did not determine the existence of demand and the TIF justified the 100–acre screening criterion. Rather, the EHB determined:

> The applicant used a minimum 100–acre parcel size as a screening criterion since it was determined that it could not develop a large mixed-use, master-planned commercial development on a smaller-sized parcel *given the topography through the market area, the standard municipal development requirements and the need for sufficient leaseable space to pay for normal and routine infrastructure improvements.* (Ex. P–3; Transcript page 238)

F.F. No. 322 (emphasis added). Thus, the EHB determined the 100–acre screening criterion was reasonable based on the topography of the market area, standard municipal development requirements; and the need for sufficient leaseable space to pay for routine infrastructure improvements. This determination is directly supported by the alternatives analysis. R.R. at 1276a–1277a.

 In addition, Objectors offered no evidence that a viable retail development could be accomplished on a smaller parcel in the Upper Allegheny Valley. Objectors' expert did not identify any specific alternative site he believed could accommodate Permittee's project. F.F. No. 251. Moreover, Objectors' expert participated in an alternatives analysis for a competing development located approximately 1½ miles

---

9. With regard to the geographic scope of Permittee's off-site alternatives analysis, Objectors also argue the analysis is flawed because it fails to consider alternatives Permittee considered in its actual search for development sites. To the contrary, although Permittee initially examined a wider range of sites throughout Allegheny County, it excluded other areas based upon its conclusion that northeastern Allegheny County was the most viable because the market was vastly underserved, and its retail clients expressed interest in the area. *See* F.F. Nos. 262, 264–65, 275.

from Permittee's project site and concluded there were no practicable alternatives. F.F. No. 242. Also, Objectors' expert opined the screening criteria Permittee used were "logical and rational." F.F. No. 233.[10] Finally, the evidence submitted by Objectors' expert supports the inference that the 100–acre size requirement was a reasonable screening criterion. *See* F.F. No. 321.[11]

### D.

Objectors next argue the EHB erred in failing to scrutinize the "raw data" Permittee utilized to exclude alternative parcels. Based on Permittee's site selection criteria, Objectors contend, the record does not contain substantial evidence to support a determination that no practicable off-site alternative existed. The record refutes this assertion.

In its alternatives analysis, Permittee identified the following site selection criteria to evaluate alternative sites: major highway proximity, visibility, feasibility and accessibility, existing land use/human impacts, parcel size and physical and environmental constraints. R.R. at 1277a–78a.

In conducting its alternatives analysis, Permittee considered 30 sites in northeastern Allegheny County. F.F. No. 17. It

eliminated 16 of the 30 sites on the ground they were less than 100 acres. R.R. at 1279a. It performed a detailed analysis of the remaining 14 properties, and determined, with the exception of the Deer Creek site, each of the parcels failed under one or more of its site selection criteria. *See* R.R. at 1278a–1284a. Permittee concluded the Deer Creek site was the only practicable alternative. R.R. at 1284a.

Based upon Permittee's "off-site" alternatives analysis, the DEP biologist who reviewed the analysis opined:

> [Permittee] has submitted alternatives analyses that consider both off-site and on-site alternatives to the proposed project. . . . In response to [our] comments, [Permittee] expanded the property search to include an evaluation of smaller parcels, and parcels comprised of several smaller properties. They have still concluded that no other suitable properties are available to meet the project purpose. . . . [Permittee] has met the requirements for the off-site alternatives analysis.

R.R. at 296a. Based upon its review of the off-site alternatives analysis, the EHB agreed no practicable off-site alternative site existed, stating:

10. Further, we reject Objectors' argument that, because Permittee constructed retail developments on smaller parcels in other areas, a smaller project would be viable in the Upper Allegheny Valley area. This argument overlooks the specific topographic challenges which are unique to the area. *See* R.R. at 654; 948a.

11. Objectors also argue the EHB erred in accepting the alternatives analysis because Permittee eliminated off-site alternatives based upon a perceived risk of mine subsidence. This argument fails for several reasons. First, no off-site alternative was excluded solely on the basis of a perceived risk of mine subsidence. Rather, alternative parcels

with a risk of mine subsidence were also excluded because the parcels were not for sale, were not accessible without land condemnation or were burdened by greater wetland impacts than the chosen site. R.R. at 1279a, 1280a, 1282a.

In addition, in considering whether an alternative is practicable, an applicant may take into account "costs and logistics." *See* 25 Pa.Code § 105.18a(b)(3). In this regard, Richard Machak, Woodmont's President of Development Services, testified the costs associated with mine stabilization are prohibitive. R.R. at 1038a–1042a. Therefore, we discern no error from the elimination of parcels based upon the risk of mine subsidence.

As part of its off-site alternative analysis, [Permittee] conducted an exhaustive search for other practicable alternatives that [DEP] just as exhaustively questioned. [Permittee's] lead real estate consultant . . . who has many years of experience in the Pittsburgh real estate market, personally identified the 30 parcels considered in the Alternatives Analysis. As part of its second application [Permittee] provided an extensive and detailed analysis of the off-site alternatives. [DEP] reviewed this analysis and asked follow up questions, both in various meetings, phone conversations, and writing.

A group of consultants both compiled and investigated the Alternatives sites. This group included the commercial real estate broker, Mr. Edwards; an[ ] engineer and expert in transportation, Mr. Raymond Caruso; a biologist, Mr. Patrick Gavaghan; a construction engineer, Mr. Richard Machak; and a civil engineer, Mr. Gary Scheffler. Together these consultants spent hundreds of hours in the field and analyzing the data to determine, for one reason or another, that none of the alternatives would satisfy the basic project purpose.

Mr. Edwards personally determined each property's availability. Since many of the properties were not on the real estate market Mr. Edwards contacted the owners directly. Even though the minimum site size was 100 acres, Mr. Edwards contacted owners of properties as small as 20 acres to attempt to cobble several parcels together to create a parcel of sufficient size. [Permittee] performed a detailed analysis of all 30 parcels. However, it then whittled the list down to thirteen properties and explored these in even greater detail. Each failed under or one or more of the site selection criteria. At the end of the day and after still more investigation by

[DEP] only the [Deer Creek] site was found to be suitable for the project.

EHB Adj. at 61. The EHB's determination that Permittee conducted an "exhaustive" search for a practicable off-site alternative is directly supported by Permittee's off-site alternatives analysis, R.R. at 1278a–1292a, 1297a–99a, 1339a–1378a, 1453a–1464a, 1519a–1520a, 1545a–46a, and the testimony of its "team" of experts. R.R. at 648a–49a, 660a–62a., 668a–672a. Accordingly, the EHB properly examined Permittee's "raw data," and substantial evidence supports its determination that no practicable off-site alternatives exist.

**E.**

██ Objectors also contend the EHB erred in failing to find the "Zamias site," a nearby site now under construction by one of Permittee's competitors, the Mills Corporation, is a practicable alternative. Because the Mills Corporation is developing the site as a commercial property, they assert, such a project was clearly feasible on that site. For several reasons, we disagree.

First, the EHB specifically found Objectors failed to prove any practicable alternative existed. As noted, the EHB determined Objectors' expert presented no evidence that any alternative sites were available. F.F. No. 251. In addition, the EHB found Objectors failed to present testimony by another expert listed in their pre-hearing memorandum as an expert to testify concerning Permittee's alternatives analysis. F.F. No. 256. Thus, Objectors produced no evidence that any site, including the Zamias site, was a practicable alternative.

Further, there is ample record evidence which indicates Permittee considered the Zamias site, and concluded it was not a viable alternative. Specifically, Permit-

tee's alternatives analysis indicates Zamias, the owner of the parcel, was looking for an investor in its project, not to sell the land for another project. R.R. at 1281–82. Stephen Coslik, Chairman and CEO of the Woodmont Company, testified Permittee evaluated the Zamias site in 1996, and was advised it was not available because the owners intended to construct their own mall on the property. R.R. at 1016–18a. Further, in its alternatives analysis, Permittee determined a larger section of Deer Creek would be impacted at the Zamias site than at its chosen site. R.R. at 1282a. Accordingly, there is substantial evidence that the Zamias site was not available for this project and not a practicable alternative.[12]

## IX. "On–Site" Alternatives

Objectors next assert the EHB erred in determining Permittee presented sufficient evidence to rebut the presumption that "on-site" alternatives exist that would have less adverse wetland impact. *See* 25 Pa. Code § 105.18a(B)(3)(ii)(B) (applicant must prove that a reduction in the size and scope of its proposed project that would result in less adverse wetland impact will not accomplish basic project purpose). Specifically, they argue the EHB failed to address whether the scope of the project could be reduced through elimination of some of its components. Further, Objectors contend the project could be reduced in size, allowing for consideration of a wider range of alternatives. They rely on *Mock v. Dep't of Envtl. Res.*,[13] as an exam-

ple of a more vigorous on-site alternatives analysis.

Through its two applications, Permittee considered a total of 12 alternative "concept plans" or on-site designs in an effort to minimize the wetland impact while preserving the project purpose. R.R. at 1324–1335. Permittee used seven criteria to evaluate alternative on-site designs: (i) highway access and visibility; (ii) compliance with requirements of prospective retail tenants such as adequate parking area; (iii) compliance with municipal regulations; (iv) compliance with flood plain regulations; (v) economic practicability; (vi) construction requirements; and (vii) total buildable area. R.R. at 1327a, 1334a.

Permittee evaluated the overall environmental impact of each of the 12 alternatives, with regard to: (i) wetland impact, (ii) stream relocation, (iii) replacement wetlands, (iv) stream mitigation and (v) culvert length. R.R. at 1335. Ultimately, Permittee determined its on-site alternatives analysis demonstrated its chosen concept plan was the least environmentally damaging while still accomplishing its basic project purpose. *Id.*

Of further note, Permittee directly responded to DEP's requests after it deemed Permittee's first on-site alternatives analysis inadequate. The EHB explained the significant on-site design changes between the first and second applications, stating:

> In its first application, [Permittee's] analysis of practicable on site alternatives assessed seven conceptual plans.

---

**12.** Objectors also challenge the EHB's finding that the proposed project "would have to be roughly the size it is to successfully compete with the Mills Corporation Project." F.F. No. 253. They argue this finding does not justify setting a 100–acre minimum size for potential alternatives. The EHB, however, did not rely upon this finding in determining the 100–acre screening criterion was appropriate. Rather,

this finding is merely a summary of opinion testimony offered by Objectors' expert. As noted above, Permittee's minimum acreage criterion was based upon other factors.

**13.** 154 Pa.Cmwlth. 380, 623 A.2d 940 (1993) (*en banc*), *aff'd*, 542 Pa. 357, 667 A.2d 212 (1995), *cert. denied*, 517 U.S. 1216, 116 S.Ct. 1841, 134 L.Ed.2d 943 (1996).

The evidence shows that [Permittee] was not able to develop a plan that would not impact some wetland acreage and still achieve its basic purpose. It proposed Conceptual Plan No. 7, which would impact a total of 6.10 acres of wetlands.

Following its review of Conceptual Plan No. 7, [DEP] was not satisfied and required further work on the part of [Permittee]. In its second application, [Permittee] proposed five additional conceptual plans. A major difference in the additional proposals is that they do not call for the relocation of Deer Creek. [Permittee] proposed Conceptual Plan 8D, which reduced wetland impacts to 5.89 acres. [Permittee] was also required to provide 7.16 acres of replacement wetlands, which exceeds the minimum regulatory replacement rate of 1:1. 25 Pa.Code § 105.20a(a)(1).

Even with this submission, [DEP] still required more on site changes. It required [Permittee] to eliminate nearly all impacts to Wetland No. 7, the best functioning wetland on the site. [Permittee] was also required to provide a wildlife buffer around the largest replacement wetland. Finally, after [DEP's] central staff became involved in the permit review, [Permittee] was required to upgrade its stormwater management plan and to install infiltration trenches, an additional stormwater control. Since the flat pad area was reduced from 123 to 107 acres, this should result in less total runoff.

EHB Adj. at 58.

Notably, in its second application Permittee scaled back the size of its development significantly. In its first application Permittee indicated 123 acres of buildable area were required to carry out its project. However, in its second application, Permittee proposed 114 acres, which it ultimately reduced to 107 acres to incorporate DEP's requests for, among other things, additional riparian buffer areas, implementation of water quality control facilities and access road revisions. *See* F.F. No. 298. In contrast, Objectors produced no credible evidence that a practicable on-site alternative existed. F.F. No. 317.

■ Based upon the evidence it received, the EHB agreed that there were no practicable alternative designs that would eliminate or reduce wetland impacts. *See* EHB Op., Conclusion of Law (C.L.) No. 17. The EHB determined, based on the evidence before it, Permittee rebutted the presumption that a practicable on-site alternative existed. C.L. No. 18. Substantial evidence supports these determinations. R.R. at 1326a–1335a, 1381a–1389a, 1466a–1492a, 1546a–1550a.

*Mock*, relied upon by Objectors, does not compel a different result. There, DER denied the Mocks' application for a permit to fill .87 acres of wetlands to construct an auto maintenance facility. The denial was based, in part, on the Mocks failure to minimize negative impact by considering reducing the size of the project or changing its proposed use. The Mocks appealed, arguing denial constituted an unconstitutional taking of their property. With regard to on-site alternatives, the EHB determined nothing in the record suggested the Mocks considered reducing the size of the project or changing it to a different use. The EHB further determined the Mocks' proposal to create .38 acres of replacement wetlands did not compensate for the environmental harm caused by the loss of .87 acres of wetlands. Thus, the EHB upheld denial of the permit. On appeal to this Court, the sole issue was whether DER's permit denial accomplished a taking. We held it did not.

Unlike the Mocks, Permittee carefully considered numerous alternative on-site

designs to reduce the wetland impact while still accomplishing its basic project purpose. Indeed, Permittee considered 12 alternative on-site plans, which incorporated specific development scenarios suggested by DEP, as well as scenarios it derived on its own. R.R. at 1334. As recognized by the EHB,

> the facts of the present case are a textbook example of how an applicant should proceed when applying for a permit under which wetlands will be impacted. [Permittee's] application underwent intense scrutiny by the [DEP] and where problems in the application were encountered, [Permittee] proposed and adopted measures to reduce the environmental incursion to a minimum....

EHB Adj. at 59.

Further, unlike the Mocks, Permittee undertook substantial measures to reduce the overall environmental impact of its proposed project. Specifically, Permittee proposes to: construct 7.17 acres of replacement wetlands to compensate for the 5.89 acres being impacted; avoid substantially impacting the most highly functional wetland on the site; construct a 93–acre conservation easement; create a wetlands enhancement program to eliminate invasive plant species and plant more beneficial species; and provide a system to filter out contaminants of water flowing into Deer Creek. See F.F. Nos. 160, 166, 325, 328, 330, 334.

The EHB determined Objectors failed to produce evidence that any reduction in

size or scope that would still result in a viable project would reduce impact to the wetlands. As with numerous other assertions advanced by Objectors, their contentions to the contrary improperly invite a re-weighing of the evidence. Based upon the evidence presented, Permittee convinced both DEP and the EHB no practicable on-site alternative existed. Because Objectors' failed to produce any credible evidence that an on-site alternative existed that would reduce the impact to the wetlands while still accomplishing the basic project purpose, their arguments fail.[14]

For the foregoing reasons, we affirm.

### *O R D E R*

AND NOW, this 7th day of December, 2004, the order of the Environmental Hearing Board is AFFIRMED.

---

14. Objectors also contend the EHB erred in failing to address a "briefing paper" generated approximately two months before issuance of the permit in which Tim Dreier, Regional Water Manager of DEP's Southwest Regional Office, stated the project could be reduced in scope. This argument overlooks the fact that, in the months after the briefing paper was generated, Permittee submitted additional information which was sufficient to satisfy DEP's remaining concerns. F.F. Nos. 309–310; R.R. at 918a–919a. In addition, before the EHB, Dreier testified he did not personally review Permittee's alternatives analysis; rather, he relied on the opinions of his staff, including biologist Nancy Rackham, who determined Permittee adequately explored possible on-site alternatives. R.R. at 503a–504a, 506a, 521a.