# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| United Refining Company, | : | |
| Petitioner | : | |
| | : | |
| v. | : | No. 1321 C.D. 2016 |
| | : | Argued: April 4, 2017 |
| Department of Environmental | : | |
| Protection, | : | |
| Respondent | : | |

BEFORE: HONORABLE P. KEVIN BROBSON, Judge
HONORABLE PATRICIA A. McCULLOUGH, Judge
HONORABLE MICHAEL H. WOJCIK, Judge

OPINION BY JUDGE BROBSON            FILED:  June 12, 2017

Petitioner United Refining Company petitions for review of an order of the Environmental Hearing Board (Board), dated July 7, 2016, which dismissed Petitioner's appeal of an oil permit issued by Respondent Department of Environmental Protection (Department) to Intervenor John D. Branch (Branch). Petitioner contends that the Board's decision is not supported by substantial evidence and violates Pennsylvania environmental law and Article I, Section 27 of the Pennsylvania Constitution, commonly referred to as the Environmental Rights Amendment.  We now affirm.

## I.    BACKGROUND

The following facts are undisputed based upon the parties' stipulation of facts and the filings of record.  Since 1902, Petitioner has owned and operated an 83-acre petroleum refinery in Warren, Pennsylvania (Property), which extends approximately 1.6 miles along the north shore of the Allegheny River.  The subsurface below the Property includes the Warren 1st and Warren 2nd Sands, and

the Glade and Clarendon Sands. The top of the Clarendon Sands is approximately 780 feet below the surface of the Property. Petitioner has constructed several aboveground storage tanks on the Property, including Tank 234 located on the northern portion of the Property. Tank 234 has the capacity to contain 3.6 million gallons of gasoline. Tank 234 has a steel floor, concrete ring wall, and an earthen dike designed to contain 110% of its contents. It sits on fill materials, soils, gravels, silt sands, and clays, and the bedrock is approximately 75 feet below the bottom of the tank. Petitioner inspects Tank 234 every four years, and it last inspected the tank in November 2014 and discovered no problems.

Since 1990, Petitioner has installed over 100 monitoring wells on the Property. Petitioner has never drilled an oil or natural gas well on the Property, although the Department's records indicate that four oil or natural gas wells were previously drilled on the Property. In 2001, Petitioner discovered an oil plume below Tank 234, and the plume measured approximately 265 feet long by 180 feet wide at the time the parties entered into their stipulation. Petitioner has recovered in excess of 12,500 gallons of oil from the plume. Petitioner has used crude oil at the Property but not in the area of Tank 234. There is no direct evidence of unplugged wells near or under Tank 234 or anywhere else on the Property, and Petitioner is unaware of any property damage, surface damage, or environmental harm caused by hydraulically fracturing wells in the Glade or Clarendon Sands in Warren, Pennsylvania.

Branch has been in the oil and gas business for 31 years and in the drilling business for 15 years. He has drilled approximately 60 oil and gas wells within the City of Warren, Pennsylvania. On September 16, 2014, Branch submitted a permit application to the Department for authorization to drill an oil

2

well—Well 61—in Warren, Pennsylvania. Pursuant to the application, Branch planned to drill Well 61 on a slant, with the top-hole location across the street from the Property and the bottom-hole location under the Property. At the time Branch submitted the permit application, he also submitted five other permit applications for wells located near the Property. Prior to the Department's approval of the permit for Well 61, Branch met with representatives of Petitioner to tour the plant and discuss his proposed drilling plans under the Property.

On October 24, 2014, Petitioner expressed concerns to the Department regarding Branch's proposed Well 61 and other proposed wells closest to Tank 234, including a concern that fracking pressures could reach historic wells and be released through unplugged wells to the surface. On November 5, 2014, Branch responded to the Department regarding Petitioner's concerns. In so doing, Branch informed the Department that it was his opinion that any wells in the area that were not plugged with cement would likely already have been plugged naturally, as there is anywhere from 55 feet to 95 feet of gravel in the valley of Warren. To avoid risks in response to Petitioner's concerns, Branch stated that he would not frack in the Warren 1st or Warren 2nd formations and that he would utilize conductivity and video logs when he drilled the new wells and would avoid hydraulically fracturing in the vicinity of zones indicated by these logs as having excessive water. Branch stated that he and his team would closely watch the pressure gauges when hydraulically fracturing and, if the gauges indicated connection with another well, would cease operations immediately. Finally, Branch advised the Department that he would conduct hydraulic fracturing with smaller amounts of sand and water to control the length of the fractures. Branch

also altered the proposed termination point of Well 61, so as to avoid the vicinity of the oil plume below Tank 234.

The Department issued permits for the six wells on November 12, 2014, including the permit for Well 61.[1] One of the special conditions for the permits was that fracking operations would not be conducted in the Warren 1st or Warren 2nd formations. Thereafter, Petitioner appealed the issuances of the permits to the Board, identifying its concern that energy released by Branch's fracking could be conveyed through an unplugged well and result in damage to Petitioner and the surrounding community, including potentially a large-scale fire or explosion, as well as a release of oil into the water of the Commonwealth.

The Honorable Thomas W. Renwand, Chief Judge and Chairman of the Board, conducted a hearing at which the parties presented their stipulation of facts and the testimony of Timothy Ruth (Ruth), a geologist and employee of Petitioner; Craig Lobins (Lobins), a professional geologist who is employed by the Department as the Northwest District Oil & Gas Manager; and Branch. Following the hearing, the Board issued an adjudication, dated July 7, 2016, dismissing the appeal relating to Well 61 and upholding the permit issued by the Department for Well 61.

In addition to findings based upon the facts summarized above, the Board made findings based upon the testimony received during the hearing. For instance, with regard to the geology, the Board found that there are various layers

---

[1] Although the Department granted all of the well permits, Branch allowed the permits for the wells other than Well 61 to expire without drilling the wells.

4

of bedrock between 75 and 750 feet below the surface of the Property, and that fracking would take place at various depths between 750 and 850 feet below the Property. Well 61 would be located a little less than 300 feet from Tank 234, the distance between Tank 234 and where the hydraulic fracturing would occur in Well 61 is approximately 300 to 360 feet, and the fractures would travel 150 feet horizontally and would be 600 to 800 feet below the surface of the Property. With regard to the oil plume, the Board found that it consists of multiple components and is likely from multiple sources.

With regard to the testimony of Lobins, presented on behalf of the Department, the Board found that Lobins was very familiar with conventional well drilling and instances where conventional wells fracked into abandoned oil and gas wells. Lobins issued the permit for Well 61, was aware that Branch planned to use a slant drilling technique, and had no problem with the use of that technique. Furthermore, Lobins testified that the fracking of Well 61 would break away from Tank 234 and would be too far underground to impact Tank 234, the plume, or the Property. He opined that, because no fracturing would occur in the Warren 1st or Warren 2nd formations and because fractures would stay in the zones being fractured, there would be no effects on Tank 234 or the plume. The Board also found that both Lobins and Branch testified that the drilling of Well 61 is unlikely to create fractures impacting the plume or Tank 234, communicate with any undocumented wells, impact groundwater, or impact the surface.

Based on its findings, the Board concluded that Petitioner had not met its burden to prove by a preponderance of the evidence that the Department abused its discretion by acting unreasonably and/or in violation of the laws of the Commonwealth when issuing the permit. In so doing, the Board explained that it

5

dismissed Petitioner's appeal on the basis that Petitioner had not met its burden of proof because Petitioner failed to present sufficient expert testimony to demonstrate actual risks associated with the drilling.

## II. ANALYSIS

On appeal to this Court,[2] the issues are as follows:[3] (1) whether the Board incorrectly applied the burden of proof; (2) whether the Board erred in concluding that the Department's issuance of the permit for Well 61 was reasonable and in accordance with the law; and (3) whether issuance of the permit violates Article I, Section 27 of the Pennsylvania Constitution.[4]

---

[2] "Our scope of review of an order of the Board is whether the Board committed an error of law or a constitutional violation, or whether any necessary findings of fact are not supported by substantial evidence." *The Ainjar Trust v. Dep't of Envtl. Prot.*, 806 A.2d 482, 487 (Pa. Cmwlth. 2002).

[3] Petitioner's brief includes a statement of the questions involved, and the Department's and Branch's briefs contain counter-statements of the questions involved, all of which phrase the issues differently. The issues now set forth by the Court fairly represent the issues presented by the parties.

[4] On March 14, 2017, during the pendency of this appeal, Branch filed with this Court a motion to dismiss this appeal on the basis of mootness, asserting that he "spud" Well 61 on November 9, 2015, to avoid expiration of the permit; drilled Well 61 to total depth as of September 27, 2016; received written approval from the Department to hydraulically fracture Well 61 on December 27, 2016; began hydraulically fracturing Well 61 on March 2, 2017; and finished hydraulically fracturing Well 61 on March 3, 2017, without incident or any known adverse effect to the environment, Tank 234, the surface, or anything else. Branch argued that in light of the completion of the fracturing, the appeal became moot. The Department joined in Branch's motion. Petitioner objected to the dismissal, contending that the matter is not moot because the permit authorizes Branch to engage in future fracking and operations of Well 61, thereby causing Petitioner to remain at risk. Petitioner also appeared to disagree with Branch's contention that no harm resulted from hydraulically fracturing Well 61. By order dated March 24, 2017, the Court denied the motion to dismiss.

At the outset, we note that Petitioner's overarching theme in this appeal is that the Department's approval of the permit for Well 61 is at odds with the *purposes* of what is commonly referred to as the Oil and Gas Act, 58 Pa. C.S. §§ 3201-3274, which Petitioner characterizes as assuring safe oil and gas development. Petitioner even suggests that "this is not a case . . . that requires a close reading of statutory language or an analysis of legislative intent." (Petitioner's Br. at 19.) While Petitioner asserts that the permit violates the purposes of the Oil and Gas Act by threatening the health and safety of the environment, its personnel and facilities, and the surrounding residents, Petitioner does not assert that issuance of the permit actually violates a substantive provision of the Oil and Gas Act.

Pursuant to Section 3211(e.1) of the Oil and Gas Act, 58 Pa. C.S. § 3211(e.1), the Department may deny a permit for an oil or gas well for any of the following reasons:

> (1) The well site for which a permit is requested is in violation of any of this chapter or issuance of the permit would result in a violation of this chapter or other applicable law.
>
> (2) The permit application is incomplete.
>
> (3) Unresolved objections to the well location by the coal mine owner or operator remain.
>
> (4) The requirements of section 3225 (relating to bonding) have not been met.
>
> (5) The department finds that the applicant, or any parent or subsidiary corporation of the applicant, is in continuing violation of this chapter, any other statute administered by the department, any regulation promulgated under this chapter or a statute administered by the department or any plan approval, permit or order of the department, unless the violation is being corrected to the satisfaction of the department. . . .

7

(6) The applicant failed to pay the fee or file a report under section 2303(c) (relating to administration), unless an appeal is pending. . . .

If none of the six statutory reasons for denial exist, then the Department is required to issue the permit within 45 days. Section 3211(e) of the Oil and Gas Act, 58 Pa. C.S. § 3211(e). Third parties, such as Petitioner, have a right to appeal to the Board the Department's issuance of a permit. Section 4 of the Environmental Hearing Board Act, Act of July 13, 1988, P.L. 530, 35 P.S. § 7514. The Board must determine whether a party appealing the issuance of a permit has demonstrated its case by a preponderance of the evidence. *See* 25 Pa. Code § 1021.122(a). Petitioner had the burden before the Board to show by a preponderance of the evidence that the Department acted arbitrarily or abused its discretion when it issued the permit for Well 61. *See* 25 Pa. Code § 1021.122; *Pa. Trout v. Dep't of Envtl. Prot.*, 863 A.2d 93, 105 (Pa. Cmwlth. 2004) ("[A] party protesting [the Department's] issuance of a permit has the burden to show, on the record produced before the [Board], issuance of the permit was arbitrary or was an abuse of discretion.").

## A. Whether the Board Incorrectly Applied the Burden of Proof

Petitioner argues that the Board incorrectly applied the burden of proof by requiring Petitioner to establish that damage to persons or the environment from the drilling of Well 61 was more likely than not. Petitioner contends that the Board should have required Petitioner to show, by a preponderance of the evidence, only that the Department's decision to grant the permit was unreasonable, arbitrary and capricious, an abuse of discretion, or contrary to law. Petitioner relies on one passage of the Board's opinion, which provides: "In other words, a party cannot simply come forward with a laundry list

8

of potential problems, and then rest their case. They must prove by a preponderance of the evidence that these problems are likely to occur." (Board's Adjudication at 8, attached to Petitioner's Br. as Ex. "A.") Petitioner contends that by focusing on the likelihood of harm rather than the Department's decision, the Board asked the wrong question. Under this faulty approach, as characterized by Petitioner, any risky activity, no matter the magnitude of harm that could potentially result, would be deemed to be acceptable unless a party could prove that it likely would occur. Petitioner argues that this standard is incorrect, because in order to meet its burden of proof, it is not necessary for Petitioner to show that a release or explosion at Tank 234 is more likely than not to occur or is a scientific certainty. Thus, Petitioner asserts that the Department erred by evaluating the preponderance of the evidence in the context of whether it had been shown that a catastrophic event was more likely to occur than not, rather than the question presented by the appeal—*i.e.*, whether the Department's action in granting the permit under these circumstances was unreasonable or contrary to law.

In a similar vein, Petitioner also contends that the Board applied the wrong burden of proof to Petitioner's evidence regarding the existence of the old wells, which it claims are generating the oil plume. It asserts that instead of requiring Petitioner to show the existence of an unplugged well with a preponderance of the evidence, the Board imposed a higher standard by requiring Petitioner to prove the existence of an unplugged well as an "established scientific fact." (Petitioner's Br. at 32.) Petitioner contends that, at most, it needed only to show that the well is likely to exist. Specifically, Petitioner maintains that it provided extensive testimony regarding the underground plume of oil below Tank 234 that had been detected, sampled, and studied for a period of many years.

9

It also provided evidence to show that the plume exists and that it is highly unlikely to have originated from a spill or release of oil from the refinery. Petitioner asserts that, overall, it provided evidence that the most reasonable and likely explanation for the oil plume is an abandoned well, yet the Board did not consider the existence of an unplugged well causing or contributing to the underground plume because it was not shown by Petitioner to be a "scientific fact." This is a key issue because, according to Petitioner, once there is recognition of the existence of an unplugged well, then the entire analysis of the reasonableness of the Department's issuance of the permit changes. The unplugged well establishes a clear prime pathway for the impact and energy of the fracking to be communicated outside of the planned zone of fracturing and presents a much greater risk to Tank 234. Thus, Petitioner maintains that the application of the wrong burden of proof as to whether an abandoned or unplugged well exists on the Property changed the entire dynamic of the Board's analysis of the likelihood of the risk presented by the permit and the reasonableness of the Department's action in issuing the permit.

The Board, in its opinion, set forth a detailed explanation of the burden of proof when it wrote:

> The burden to show that the permit should not have been issued is on the party challenging the permit. [Petitioner], therefore, must prove by a preponderance of the evidence that the permits should not have been issued. To prove one's case by a "preponderance of the evidence" means that the "evidence in favor of the proposition must be greater than that opposed to it. . . . It must be sufficient to satisfy an unprejudiced mind as to the existence of the factual scenario sought to be established." Therefore, [Petitioner] was required to present evidence that the Department's issuance of the permit to . . . Branch was not appropriate or did not

10

> conform with the applicable law or was unreasonable, and *its evidence must be greater than the evidence showing that the issuance of the permit was appropriate or in accordance with the applicable law*.
>
> In other words, an appellant must come forward and prove their allegations by a preponderance of the evidence. They may not simply raise an issue and then speculate that all types of unforeseen calamities may occur. When they raise technical issues they must come forward with technical evidence. In many cases, such as this one, they need expert testimony to prove their claims. In other words, a party cannot simply come forward with a laundry list of potential problems and then rest their case. *They must prove by a preponderance of the evidence that these problems are likely to occur*.

(Board's Adjudication at 8 (internal citations omitted) (emphasis added).)

With regard to its application of the burden of proof, the Board then further explained that it recognized Petitioner's witness, Ruth, as an expert in the field of geology but not in the area of drilling oil and gas wells or the intricacies of hydraulic fracturing. Although Ruth raised legitimate concerns about the risks of drilling a well at the proposed location, his testimony was not sufficient to satisfy the burden of proof. The Board wrote:

> The evidence regarding unplugged wells in the vicinity of Tank 234 is speculative, rather than established scientific fact. [Petitioner] concedes that there may not be any wells in that location. *Even more importantly, the testimony does not provide a scientific basis for how the drilling of Well . . . 61 would impact either the plume or Tank 234*.

(Board's Adjudication at 9 (emphasis added).) Thus, Ruth's concerns were not supported by his testimony.

It is important to note that Ruth's testimony regarding his concerns was not the only testimony considered by the Board. Rather, the Board considered

11

the expert testimony of the Department's witness, Lobins, and the testimony of Branch. The Board wrote:

> Mr. Lobins testified that the *safeguards in the permit that allow hydraulic fracturing to occur in only certain zones will allow the drilling to take place without any impact to the surface or the structures on it.* Mr. Lobins testified that even if there are unplugged wells and even if those unplugged wells were impacted by the drilling (big if's based on his testimony), he opined that there would be little or no impact to any of the structures on [Petitioner's P]roperty and that any impacts could be quickly and easily addressed. Mr. Branch, an experienced oil and gas operator, who also was qualified as an expert, testified as to his drilling plan and about the many wells he has drilled without incident in this locale. The expert testimony as a whole leads us to conclude that there is justification under the law to issue the oil and gas permit under appeal.

(Board's Adjudication at 9 (emphasis added).)

The Board finished its preponderance of the evidence analysis by concluding that the weight of evidence did not demonstrate that Branch's drilling of an oil and gas well is likely to impact Tank 234 or the Property adversely. It noted that "[t]he facts and expert testimony do not prove by a preponderance of the evidence that drilling would damage or otherwise impact [Tank 234, the] plume, or [the P]roperty." (Board's Adjudication at 10.)

We agree with Petitioner that, to the extent that the Board's discussion of the burden of proof could be interpreted to require Petitioner to prove every factual detail by a preponderance of evidence or require Petitioner to prove that it was more likely than not that harm would occur, such an interpretation would impose a higher burden than required. The Board was required to determine whether, based upon its factual findings, Petitioner proved by a preponderance of

12

the evidence that the Department acted arbitrarily or abused its discretion. We can envision a scenario where the likelihood of the harm occurring is significant but *less* than fifty percent likely. The severity of the possible harm, however, could be so immense that issuing a permit could be determined to be abuse of discretion. To require a petitioner to prove a fifty percent or greater likelihood that the harm will occur would unduly restrict the Board's ability to consider the reasonableness of the issuance of a permit under this or any other similar scenario.

We are not convinced that the Board in this case, however, wrongly *applied* the burden of proof to the evidence presented. Petitioner had the burden to prove, by a preponderance of evidence, that the Board's issuance of the permit was arbitrary or an abuse of discretion. 25 Pa. Code § 1021.122; *Brockway Borough Mun. Auth.*, 131 A.3d at 587; *Pa. Trout*, 863 A.2d at 105. The appeal involved technical issues, and expert testimony is required where the issues require scientific or specialized knowledge or experience to understand. *Dep't of Transp. v. Agric. Lands Condemnation Approval Bd.*, 5 A.3d 821, 828-29 (Pa. Cmwlth. 2010). After weighing the evidence and testimony presented, the Board found that Petitioner did "not provide a scientific basis for how the drilling of Well 61 will impact either the plume or Tank 234." (Board's Adjudication at 9.) The Board essentially found that even if it were to accept that an unplugged well existed in the vicinity of Tank 234 or Well 61, Petitioner still did not present testimony as to how the drilling or fracturing of Well 61 could communicate with the unplugged well or negatively impact either the plume or Tank 234. Absent some supporting expert testimony or facts, Petitioner could not prove by a preponderance of the evidence that the permit for Well 61 should not have been issued. In other words, Petitioner did not support its claims with credible expert

13

testimony and, thus, failed to meet its burden of proof. By contrast, the Department and Branch provided credible testimony from expert witnesses that refuted Petitioner's concerns.[5]

## B. Whether the Department's Issuance of the Permit for Well 61 Was Reasonable and in Accordance With the Law

### 1. Abnormally Dangerous Activity

With regard to whether the Board erred in concluding that the Department's issuance of the permit for Well 61 was reasonable and in accordance with the law, Petitioner approaches this issue by focusing on what it characterizes as the "unique characteristics of Branch's proposed project" and by asserting that the nature of the project requires a greater deal of scrutiny. (Petitioner's Br. at 34.) Petitioner points out that even the Board recognized that this was a "unique" permitting situation. (Board's Adjudication at 10.) Petitioner analogizes Branch's proposed project—drilling and fracking underneath an oil refinery and a 3.6 million gallon gasoline storage tank in close proximity to an underground oil plume evidencing the potential for an abandoned well and near a neighborhood— which it characterizes as unique and dangerous, to the tort concept of an abnormally dangerous activity. As such, Petitioner asserts that issuance of the permit for Well 61 should be subject to a higher degree of scrutiny and that the Department's evaluation of the application was far below the appropriate level of

_____

[5] The Board is the sole finder of fact and, as such, has sole discretion regarding witness credibility, weight of the evidence, and resolution of evidentiary conflicts. *Brockway Borough Mun. Auth. v. Dep't of Envtl. Prot.*, 131 A.3d 578, 587 (Pa. Cmwlth. 2016). On appeal of a Board decision, "this Court does not 'accept invitations to reevaluate evidence and credibility determinations.'" *Sunoco, Inc. v. Dep't of Envtl. Prot.*, 865 A.2d 960, 969-70 (Pa. Cmwlth. 2005) (citing *Birdsboro and Birdsboro Mun. Auth. v. Dep't of Envtl. Prot.*, 865 A.2d 969-70 (Pa. Cmwlth. 2005)).

care under the circumstances of this case, such that issuance of the permit constitutes arbitrary, capricious, and unreasonable decision-making.

The concept of abnormally dangerous activity applies to strict liability causes of action and is inapplicable to the instant matter which is governed by statute. Also, while not binding on this Court, the United States District Court for the Middle District of Pennsylvania has held that hydraulic fracturing is not an abnormally dangerous activity under Pennsylvania law. *See Ely v. Cabot Oil & Gas Corp.*, 38 F. Supp. 3d 518, 534 (M.D. Pa. 2014). Thus, we reject Petitioner's argument.

## 2. Reasonable Level of Scrutiny

Petitioner contends that even if the Department was not required to apply strict scrutiny, the Board still erred in affirming the issuance of the permit for Well 61 because the Department failed to apply a reasonable level of scrutiny. Specifically, Petitioner points to: (1) what it refers to as the "lack of evaluation" by the Department's program manager, Lobins;[6] (2) the uniqueness of the situation (*i.e.*, use of a slant drill under a large gasoline tank near an oil plume);[7] (3) the Department's "faulty" analysis of the risk posed by the proximity of Well 61 to

---

[6] With regard to this point, Petitioner refers to Lobins' uncertainty as to whether he was aware of Petitioner's concerns at the time the Department issued the permit and lack of understanding as to how those concerns had been evaluated.

[7] Petitioner asserts that the potential for encountering an abandoned well is greater for a slant well that travels a distance horizontally compared to a vertical well that is in a single, fixed location. Petitioner argues that the Department improperly utilized Branch's prior well projects in Warren, Pennsylvania, as a basis to evaluate the permit application for Well 61, because those projects did not involve circumstances similar to those in the matter now before the Court. In fact, Lobins testified that of the 41,000 well permits he had been involved in issuing, the permit for Well 61 was the only one that involved drilling under a refinery. (R.R. at 373a.)

15

Tank 234, which was prepared only for purposes of this litigation;[8] (4) the Department's "deficient Zone of Capture calculation";[9] (5) an overreliance on the hope that any abandoned wells would have been naturally plugged; and (6) the Department's implicit knowledge that risk is presented by these circumstances. (Petitioner's Br. at 37, 41.)

Petitioner's contention that the Board erred in concluding that the issuance of the permit was not unreasonable due to lack of adequate scrutiny by the Department appears to be based in part on Petitioner's misperception that the Board, in considering the reasonableness and legality of a permit, must confine its review to the information considered by the Department at the time it issued the permit. It is important to remember that the Board is not tasked with the duty to review the Department's decision-making process. Rather, the Board reviews the Department's issuance of a permit *de novo*, meaning it can properly consider evidence produced after the Department's action in question and in anticipation of litigation. On appeal from a decision of the Board, the Court "must review the adjudication of the Board rather than the administrative action which was reviewed by the Board." *Warren Sand & Gravel Co., Inc. v. Dep't of Envtl. Prot.*, 341 A.2d 556, 565 (Pa. Cmwlth. 1975). The Board's *de novo* review allows it to

_____

[8] Petitioner contends that the Department's evaluation of the risk was erroneous. An exhibit introduced by the Department depicting a 200-foot radius around the endpoint of Well 61 is, according to Petitioner, inaccurate and misleading because the zone of capture should have been placed at a different location. Petitioner notes that the Department, during the hearing, admitted that the zone of capture should have been placed at a different location. (R.R. at 348a, 386a.)

[9] Petitioner contends that the Department further erred by using just a 200-foot zone of capture and asserts that the Department should have used a 500-foot zone of capture based on proposed 2013 regulations that were never adopted.

admit and consider evidence that was not before the Department when it made its initial decision, including evidence developed since the filing of the appeal. The Board determines the reasonableness and legality of the Department's actions based upon the record developed before the Board.

Here, the Board heard testimony regarding the concerns expressed by Petitioner, including those identified by Petitioner in connection with the lack of scrutiny argument Petitioner now raises. Those concerns involve factual matters, and the Board considered the evidence before it in reaching its decision.[10] As discussed above, it is immaterial whether the Department considered the same matters when issuing the permit.

### 3. Issuance of Permit Without Further Special Conditions

Petitioner contends that the Department erred by issuing the permit to Branch without including, as express permit conditions, safe drilling and operating practices that Branch proposed and upon which the Department relied in making its decision to grant the permit.

The Department's authority to attach special conditions to a permit is discretionary, and the Board can properly substitute its own discretion for that of the Department and thereby order the issuance of permits subject to certain special conditions. *Pequea Twp. v. Herr*, 716 A.2d 678, 686 (Pa. Cmwlth. 1998). It appears that the Board chose not to substitute its discretion in this case because,

---

[10] "[Q]uestions of resolving conflicts in the evidence, witness credibility, and evidentiary weight are within the exclusive discretion of the [Board], the fact finding agency, and are not matters for a reviewing court." *Pa. Trout*, 863 A.2d at 104. Thus, we may not substitute our judgment for that of the Board. *Id.* To the extent that Petitioner invites us to do just that—*i.e.*, reconsider the evidence in a light more favorable to its position—we cannot do so.

having weighed the evidence, including expert testimony, it concluded that there was insufficient evidence of harm to justify imposition of additional special conditions.[11] By asking this Court to conclude that special conditions were necessary, Petitioner is essentially asking this Court to reweigh the evidence and make credibility determinations regarding the validity of Petitioner's concerns, which is beyond our purview. The Board already weighed this evidence and made credibility determinations that properly supported its decision. The Board accepted Lobins' and Branch's testimony that communication was unlikely to occur between Well 61 and the plume, an unplugged well, or Tank 234. Conversely, the Board found that Ruth's testimony regarding the existence of unplugged wells in the vicinity of Tank 234 or the plume was speculative, and Petitioner failed to present evidence supporting a "scientific basis for how the drilling of Well . . . 61 will impact either the plume or Tank 234." (Board's Adjudication at 9.)

Moreover, Petitioner provides no evidence showing that the additional conditions were necessary to ensure the permit's compliance with the law. Branch testified that these measures were added safety precautions; he did not testify that they were necessary to drill. (R.R. at 262a.) Lobins testified that the only special condition that he believed should be added to the permit was the condition that Branch would not hydraulically fracture in the Warren 1st or Warren 2nd formations. Thus, the Board did not err in concluding that the Department did not act unreasonably in failing to impose additional conditions on the permit for

---

[11] The Department did include in the permit for Well 61 a prohibition against drilling in the Warren 1st and Warren 2nd formations.

Well 61, and the Board did not err in not imposing those additional conditions on the permit itself.

## C. Whether Issuance of the Permit Violates Article I, Section 27 of the Pennsylvania Constitution

As to the alleged violation of the Pennsylvania Constitution, Petitioner argues that the Board erred in allowing the Department to issue Branch the permit for Well 61 because the Commonwealth's natural resources will be injured in violation of Article I, Section 27 of the Pennsylvania Constitution, which provides:

> The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

We agree with the Department and Branch, however, that Petitioner failed to raise his constitutional claim before the Board. Issues not raised before the Board are waived before the Commonwealth Court.[12] *Ingram v. Dep't of Envtl. Prot.*, 595 A.2d 733, 738 (Pa. Cmwlth. 1991).

---

[12] When determining whether an action violates Article I, Section 27 of the Pennsylvania Constitution, this Court must weigh the following considerations:

> (1) Was there compliance with all applicable statutes and regulations relevant to the protection of the Commonwealth's public natural resources? (2) Does the record demonstrate a reasonable effort to reduce the environmental incursion to a minimum? (3) Does the environmental harm which will result from the challenged decision or action so clearly outweigh the benefits to be derived therefrom that to proceed further would be an abuse of discretion?

*Payne v. Kassab*, 312 A.2d 86, 94 (Pa. Cmwlth. 1973), *aff'd*, 361 A.2d 263 (Pa. 1976). If we were to consider this argument, we would conclude that all of the prongs of the *Payne* test weigh in favor of constitutionality, and the Board did not err in concluding that the Department did not violate Article I, Section 27 by issuing the permit for Well 61 to Branch.

### III. CONCLUSION

For the reasons set forth above, the Board did not err in concluding that Petitioner failed to establish that the Department's issuance of a permit for Well 61 to Branch was unreasonable or contrary to law. Accordingly, the order of the Board is affirmed.

_____
P. KEVIN BROBSON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

United Refining Company,           :
                             Petitioner           :
                                      :
              v.           :   No. 1321 C.D. 2016
                                        :
Department of Environmental        :
Protection,                        :
                        Respondent           :

## O R D E R

AND NOW, this 12th day of June, 2017, the order of the Environmental Hearing Board is AFFIRMED.

_____
P. KEVIN BROBSON, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

United Refining Company,          :
                    Petitioner    :
                                  :   No.  1321 C.D. 2016
                    v.            :
                                  :   Argued:  April 4, 2017
Department of Environmental       :
Protection,                       :
                    Respondent    :


BEFORE:   HONORABLE P. KEVIN BROBSON, Judge
          HONORABLE PATRICIA A. McCULLOUGH, Judge
          HONORABLE MICHAEL H. WOJCIK, Judge


DISSENTING OPINION BY
JUDGE McCULLOUGH                          FILED:  June 12, 2017


          As recognized by the Environmental Hearing Board (Board), this matter involves a unique and unprecedented process of slant drilling by John D, Branch (Applicant), posing unknown dangers, particularly in the area near an active refinery.  The Board's decision reflects these concerns where it states: "[T]his case is unique as Mr. Lobins [the expert testifying for the Department of Environmental Protection (Department)], himself, indicated.  It is out of the ordinary for the Department to receive an application for an oil and gas permit that allows drilling by a third party underneath an oil and gas refining company in full operation and in close proximity to a 3.6 million gallon gasoline storage tank." (Board op. at 10.)

          Despite dismissing the appeal of United Refining Company (United Refining), the Board further expressed concern for the process in which the

Department engaged, calling for a "more transparent" process and improved communication among the parties, which the Board suggested as "a more robust permitting application process." (Board op. at 11.) The Majority aptly cites section 3211(e.1) of the Oil and Gas Act, 58 Pa.C.S. §3211(e.1), dealing with the sole grounds on which the Department may deny a well permit. Subsection (3) states as a specific ground for denial: "**Unresolved objections to the well location by the coal mine owner or operator**." 58 Pa.C.S. §3211(e.1)(3) (emphasis added).

Notwithstanding the above, the Board identified two significant questions or objections left unresolved by the Department when it granted the application for the permit: (1) "[H]ow would the fracking of the well impact the surface?" and, (2) "How would the fracks propagate into the unplugged wells at the depths and distances where the fracking would take place?" (Board op. at 10.) Clearly, under the Board's own analysis, there are "unresolved objections" which need to be answered by the Board.

This Court's review under the Oil and Gas Act is to ascertain whether the permitted use was shown to have been "necessary for the safe operation of a particular mine. . . ." *Foundation Coal Resources Corporation v. Department of Environmental Protection*, 993 A.2d 1277, 1290 (Pa. Cmwlth. 2010) (dealing with the prior version of this statute and applying the standards for denial in a case in which this Court affirmed the issuance of oil and gas drilling permits).

Here, the unprecedented and unique method of fracking was to occur underneath an active refinery. United Refining raised concerns about safe drilling and operating practices and the Board expressed concerns and questions about the issuance of the permits. Applicant proposed five safeguards to address United Refining's expressed concerns about Applicant's operations: (1) there would be no fracking in the Warren 1st or Warren 2nd formations; (2) conductivity and video

logs would be used when new wells were drilled and hydraulic fracturing in the vicinity of zones indicated by the logs as having excessive water would be avoided; (3) the pressure gauges would be closely monitored while fracking, and if the gauges indicated connection with another well, operations would cease immediately; (4) fracking would be conducted with smaller amounts of sand and water to control the length of the fractures; and, (5)  the proposed termination point of Well 61 was altered to avoid the vicinity of the oil plume below Tank 234.

Nonetheless, when the Department issued the permits, it imposed only the first of these special conditions proposed by Applicant.  In light of the unresolved objections and the unprecedented use of this fracking method in a potentially dangerous zone, it is incumbent upon the Board to address the remaining four proposals as special conditions to the permits.

Accordingly, I would vacate and remand to the Board to resolve the unresolved objections and questions identified by the Board in its dismissal of the appeal, and to impose any special conditions necessary to alleviate the same upon remand.

_____
PATRICIA A. McCULLOUGH, Judge